# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JEREMY DALE MCCASKILL,

    *Petitioner*,

vs.

MICHAEL BUDGE, *et al.*,

    *Respondents*.

3:08-cv-00687-RCJ-WGC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the remaining claims, petitioner's motion (#86) for reconsideration as to a prior ruling regarding Ground 5(e), and petitioner's motion (#92) for partial dismissal as to unexhausted claim Ground 5(i). The motion for dismissal of the unexhausted claim will be granted. The Court takes up the motion for reconsideration within the discussion of Ground 5(e).

## Background

Petitioner Jeremy McCaskill seeks to set aside his 2003 Nevada judgment of conviction, pursuant to a jury verdict, of second-degree murder with the use of a deadly weapon, for stabbing Joseph Galdarisi to death with a knife. Petitioner is serving two consecutive life sentences with the possibility of parole after ten years on each sentence. Petitioner challenged his conviction on direct appeal and state post-conviction review.

Petitioner, *inter alia*, challenges the sufficiency of the evidence supporting his conviction for second-degree murder. He contends that the evidence was consistent with self-defense rather than second-degree murder.

1    The evidence presented at trial included the following.[1]

2    Jeremy McCaskill, Nikki Batemon, Joe Galdarisi, and Michelle Maberry all were, to one

3    extent or another, either friends with one another or at least acquaintances as of March 2001.

4    McCaskill and Batemon further had been in a romantic relationship together before, and they

5    had a son together.  At that time, they were moving in the direction of getting back together,

6    although McCaskill at that time was more or less living with another young woman, Catina

7    Murphy.  Galdarisi and Maberry, in turn, also were in a boyfriend-girlfriend relationship.[2]

8    On March 16, 2001, McCaskill and Galdarisi planned to go to a monster truck pull

9    event that evening.  Part of the plan was for McCaskill to use the outing with Galdarisi as a

10    cover and alibi for McCaskill spending time with Nikki Batemon after the event without Catina

11    Murphy knowing that he was with Batemon.[3]

12    Prior to meeting up with Galdarisi, McCaskill stopped by the apartment of Christene

13    Cox, who was Maberry's sister and who also previously had been in a relationship with

14    McCaskill.  He left his pager with Cox so that Catina Murphy could not reach him while he was

15    out with the others.[4]

16    It is undisputed that on the way back from the monster truck show, while in Galdarisi's

17    car, McCaskill and Galdarisi got into an argument.  The argument culminated in McCaskill

18    exiting the vehicle and Galdarisi leaving McCaskill standing on the side of the road.

19    

20    [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of
evidence or statements of fact in the state court.  The Court summarizes same solely as background to the
issues presented in this case, and it does not summarize all such material.  No statement of fact made in
describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  The
significance of additional specific evidence or categories of evidence referred to by petitioner in support of his
claims is discussed in the discussion of the particular claims.  The present recital of the evidence constitutes
only an overview for context.  Any absence of mention of a specific piece of evidence or category of evidence
in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

25    [2]#66, Ex. 69, at 38-44, 48, 78, 83, 99 & 120-21 (Maberry); id., at 132-37 (Batemon); id., Ex. 70, at
179-80 & 209-10 (same); id., at 222-25, 238-39 & 250 (Murphy); id., Ex. 71, at 482-85 (McCaskill).  The
Court uses Maberry's name at the time of the offense rather than her married name, Cummings, at trial.

27    [3]#66, Ex. 69, at 44-45 & 99 (Maberry); id., at 136-38 (Batemon); id., Ex. 70, at 180-81 & 210 (same);
id., at 225-26 & 239-40 (Murphy).

28    [4]#66, Ex. 70, at 256-60 & 264.

1    Galdarisi drove on to Maberry's house, where Maberry and Batemon had been visiting

2  with one another prior to meeting up with the two men.  Galdarisi told them about the

3  argument and his leaving McCaskill on the side of the road.  He was upset, agitated and

4  excited.  Galdarisi calmed down, however, after he did a line of methamphetamine.  He told

5  Maberry that he would respect her and her home and that he would not fight there if anything

6  did happen.  Maberry testified that he relaxed "a little bit" and appeared to get less angry.[5]

7    Meanwhile, McCaskill had walked to Catina Murphy's home.  He walked in, grabbed

8  his car keys, walked out, and drove off without saying a word to Murphy.  He appeared angry,

9  irritated and upset.[6]

10    McCaskill then went back over to Christene Cox' apartment to retrieve his pager.  She

11  described him as "a little agitated," "very angry," and "ranting."  He told her he was angry

12  because he and Galdarisi had gotten into an argument and Galdarisi had stopped the car and

13  had him get out.  He still was angry but "had calmed down some" by the time that he left.  She

14  did not expect to see him again that evening at that point.[7]

15    By all accounts given at trial, including his own, McCaskill habitually carried a large

16  pocket knife with a blade that was several inches long.  Batemon, Murphy and Cox all testified

17  that they had seen him open the knife quickly with one hand by pressing a button on the knife

18  and then opening it with a flick of his wrist.[8]

19    By all accounts given at trial, including in McCaskill's testimony, Galdarisi did not have

20  a knife or any other weapon on him.[9]

21    / / / /

22

23    [5]#66, Ex. 69, at 44-47 & 100-01 (Maberry); *id.*, at 139-40 (Batemon); *id.*, Ex. 70, at 181-82 (same).

24    [6]#66, Ex. 70, at 226-28, 240, 242-43 & 250 (Murphy).

25    [7]#66, Ex. 70, at 260-62 (Cox).

26    [8]#66, Ex. 70, at 177-79, 197-201 & 214-15 (Batemon); *id.*, at 232-33 (Murphy); *id.*, at 267-68 & 270
27  (Cox).  Whether McCaskill had only one knife or multiple knives over time as he testified is immaterial.  That
   he had at least one such knife with him when he killed Galdarisi is all that is material in that regard.

28    [9]#66, Ex. 69, at 82-83 (Maberry); *id.*, Ex. 70, at 179 (Batemon); *id.*, at 307 (crime scene detective).

1    Both men were young, well-developed men of similar height.  Galdarisi was "maybe

2    a little bit . . . but not tremendously" bigger.  Both men were strong young men, but Maberry

3    testified that Galdarisi was "a lot stronger."[10]

4    On the evening in question, both men were observed to be "buzzed" drunk rather than

5    "falling down" or "stumbling" drunk, with neither man slurring his speech.[11]

6    About twenty minutes after Galdarisi arrived at Maberry's home, McCaskill bolted

7    through the door, with Nikki Batemon cutting him off.  McCaskill "got in Galdarisi's face" and

8    started yelling at him, saying "do you have a problem," and that they could "deal with it."

9    Maberry testified that "[h]e sounded angry but more sarcastic, like there was something

10   behind it."  She testified that he was angry because Galdarisi had left him on the roadside.[12]

11   Both women testified that McCaskill appeared to be the primary verbal aggressor at

12   that time.  Galdarisi, while upset, instead was trying to diffuse the situation, saying that they

13   did not have "to do this here."   Galdarisi was speaking loudly, but he frequently did so

14   because he was hard of hearing.  Galdarisi did not attempt to push McCaskill nor did he swing

15   at him.  Maberry told them to take it outside because there were children in the house.

16   McCaskill responded in a sarcastic tone that "yes, we can talk about this . . . outside."[13]

17   McCaskill went outside first, followed by Batemon.  She tried to get McCaskill to

18   promise that he would not fight, but he did not do so, just saying "don't worry about it."

19   Galdarisi stayed back a moment with Maberry.  He told her not to worry, that he would not

20   disrespect her home.  When Batemon came back inside, she heard Galdarisi tell Maberry that

21   he would "put it on his skin" that he would not fight, which was street terminology for "a

22   

23   [10]#66, Ex. 69, at 101-02, 104, 121-22 & 128 (Maberry); *id.*, Ex. 70, at 186 & 207-08 (Batemon).  The autopsy reflected that Galdarisi was 5'11" and weighed 194 pounds.  #66, Ex. 71, at 375 & 389.

24   

25   [11]#66, Ex. 69, at 53-54 (Maberry); *id.*, at 140 (Batemon); *id.*, Ex. 70, at 181-82 & 209 (same); *id.*, at 240-42 & 253-55 (Murphy).

26   [12]#66, Ex. 69, at 48-51, 122-23 & 125 (Maberry); *id.*, at 140-43 (Batemon); *id.*, Ex. 70, at 182-85 (same).

27   

28   [13]#66, Ex. 69, at 51-55, 102-04, 122-23 & 128 (Maberry); *id.*, at 143 (Batemon); *id.*, Ex. 70, at 209 & 218-221 (same, including discussion of preliminary hearing testimony).

stronger bond than like a promise." #66, Ex. 69, at 55-56 (Maberry); *id.*, at 143-48 (Batemon); *id.*, Ex. 70, at 185-86.

A few minutes later, the women heard loud voices outside, and Batemon looked out. When she first looked out, she told the men to keep the noise down because of the neighbors.  Shortly thereafter, she saw them, through the open door, arguing face-to-face, and one pushed the other, starting the physical fight.[14]

The two women then went outside.  Less than five minutes had passed at this point since the time that the men had went outside.  The women saw the men in the middle of the driveway circling each other with their arms up similar to a boxing stance.  Maberry testified that McCaskill had a very serious and angry look on his face, and it looked to her like things "were going to get pretty ugly."[15]

The women talked separately with the men, with each trying to calm their boyfriend. Galdarisi stayed angry during the time that Maberry tried to calm him down.  At some point, Galdarisi spun Maberry around and pushed her up against a car, causing a bruise.  She testified that, by this point, "he was so mad that there was just no turning back, he was angry, he wasn't going to calm down any more," which scared her.[16]

Maberry walked over to McCaskill to try and calm him down.  Maberry testified at trial that she did not know whether McCaskill had calmed down.  Batemon testified that McCaskill "wasn't calming down like I wanted him to." Maberry testified that McCaskill told Batemon to get the baby and find his hat, because he wanted to go.  Batemon did not recall McCaskill saying those things rather than herself, as she was going to go get her daughter from inside with the understanding that she and McCaskill would be leaving.[17]

/ / / /

---

[14]#66, Ex. 69, at 55-56 (Maberry); *id.*, at 147-49 (Batemon); *id.*, Ex. 70, at 186-87 (same).

[15]#66, Ex. 69, at 55-57, 104-05 & 107-08 (Maberry).

[16]#66, Ex. 69, at 57, 107-110 & 119 (Maberry); *id.*, at 149-50 (Batemon).

[17]#66, Ex. 69, at 58, 108-09 & 111-12 (Maberry); *id.*, at 150 (Batemon); *id.*, Ex. 70, at 187-89, 205-07.

1    However, as Maberry was talking to McCaskill, a Pepsi can hit Maberry in the head and

2    ricocheted close to where McCaskill was standing.  Galdarisi had been drinking the Pepsi

3    from when he was back in the house, from about twenty minutes earlier.  Maberry testified

4    that it felt like it had "a lot of fluid" in it.  Neither Bateman nor Maberry observed the can hit

5    McCaskill.  Neither Bateman nor Maberry observed any injuries on McCaskill at this point.[18]

6         Nikki Bateman was looking at McCaskill's face when the Pepsi can was thrown.  She

7    testified as follows as to what she saw reflected in his face:

8
       Q:    And describe for the jury what you saw in terms of
9             the defendant's face when that can was thrown.

10     A:    When you know somebody really well and they are
             arguing, and then they have their snapping point,
11            that is what I saw. It was like they are at the point
             where you can't help no matter what.
12
       Q:    At that point after the can was thrown, did he look
13            like he was in a rage?

14     A:    Yeah.

15     Q:    Do you recall using the phrase he snapped before?

16     A:    Yes.

17     Q:    Is that what happened?

18     A:    Yeah. I was looking at him, just the way his eyes
             looked you can tell he snapped beyond that one
19            point of being able to stop anything, and that's
             when we went into the house.
20
       Q:    And then you go back inside once you saw that;
21            correct?

22     A:    Yes.

23     Q:    Because you realized what?

24     A:    That there's nothing that I could do to stop it.

25   #66, Ex. 69, at 151-52.

26

27   _____

28      [18]#66, Ex. 69, at 57-59, 105-09, 112, 123-25 & 129  (Maberry); *id.*, at 149-51 (Batemon); *id.*, Ex. 70,
     at 189-91, 205, 218 & 221 (same).

Maberry also looked at the two men and said to Batemon "they are not going to stop." According to her testimony, after the Pepsi can was thrown, Galdarisi was the primary aggressor; and he "went after" McCaskill. However, the women did not ever see Galdarisi strike McCaskill at any time that evening.[19]

The women then went back inside. Maberry heard loud voices, but the women did not hear any signs of a physical fight after they went inside. Less than two minutes after they had gone inside, they heard the sound of a vehicle pulling out "pretty quickly." Batemon testified that they had gone inside and had just started getting their coats to leave when they heard the car pulling out quickly. When Batemon looked out, she saw the taillights of McCaskill's vehicle as he was driving away. By the time that Maberry looked out, McCaskill's vehicle already was gone.[20]

When the women went outside, they did not see Galdarisi at first. Maberry then saw him lying on his back, with his head partially underneath his car and his arms sprawled out, along with blood underneath him. Blood appeared to be coming from his upper body, and he was nonresponsive and did not appear to be breathing. When they pulled one of the cars around to put the headlights on him, they saw that the blood was worse than they thought. There was what both described as "a lot" of blood underneath him and more blood in the parking lot.[21]

The women then drove to a drug store a couple of miles away and made an anonymous 911 call. Maberry testified that they stated that they saw a fight and a body fall while driving down the road. She testified that she did so because she was high, she had children, and she had an outstanding bench warrant on a traffic ticket. Batemon testified that they panicked when they saw that Galdarisi was dead. #66, Ex. 69, at 63 & 112-13 (Maberry); id., at 156-57 (Batemon); id., Ex. 70, at 192 & 203 (same).

---

[19]#66, Ex. 69, at 109-10, 126 & 129 (Maberry); id., at 151 (Batemon); id., Ex. 70, at 191 (same).

[20]#66, Ex. 69, at 59-61 & 126 (Maberry); id., at 153-55 (Batemon); id., Ex. 70, at 191-92, 204 & 215.

[21]#66, Ex. 69, at 61-63 (Maberry); id., at 155-56 (Batemon); id., Ex. 70, at 192.

1      Meanwhile, McCaskill drove again to Christene Cox' apartment.  She testified that she

2  was in her bedroom at about 11:40 p.m. when she saw the headlights of a vehicle pulling into

3  the apartment complex parking lot.  She looked out the window and saw McCaskill pulling his

4  vehicle into the driveway.  He usually parked in front of her apartment.  However, this time he

5  drove further down and parked beside garbage cans about two apartments down from hers.[22]

6      When McCaskill came inside, he was "really like pumped up," "really excited," and

7  "agitated."  He told Cox that he needed to call her sister, Michelle Maberry, because he and

8  Galdarisi had got into a fight and he had "stuck him."  Cox understood that to mean that

9  McCaskill had stabbed Galdarisi.  McCaskill did not say that Galdarisi had attacked him with

10  a knife or a gun, that Galdarisi had any weapon, that Galdarisi had attacked him, or that he

11  had acted in self-defense.  He just stated that they were in a fight and he "stuck him."[23]

12      Cox did not see any cuts or bruises on McCaskill's head or on any other part of his

13  body.  He did take a band-aid and place it on his right index finger.  However, Cox had not

14  seen any blood on his hand or finger.  Cox did not notice any signs that McCaskill had been

15  beat up or in a fight, and she saw only that there was a lot of dirt on the lower part of his

16  pants.  She acknowledged on cross-examination that she said in her statement to the police

17  that "his face did look marked, his hands didn't."  She did not recall on redirect what she

18  meant by that, as she did not remember there being any redness on his head or face.  She

19  responded affirmatively on recross to it meaning both "dirt marks" and "injuries."[24]

20      McCaskill was at Cox' apartment for only approximately four to five minutes. McCaskill

21  told Cox that he was sorry for involving her and walked out.[25]

22    / / / /

23    / / / /

24

---

25    [22]#66, Ex. 70, at 262-63 (Cox).

26    [23]#66, Ex. 70, at 263-65, 270 & 277-80 (Cox).

27    [24]#66, Ex. 70, at 265-66 & 270-277 (Cox).

28    [25]#66, Ex. 70, at 266(Cox).

1      Thereafter, McCaskill contacted Michelle Maberry by phone and met up with Maberry
2  and Nikki Batemon near where Batemon had been staying with her grandmother.[26]

3      McCaskill admitted to having "stuck" Galdarisi.  When Maberry asked McCaskill why
4  he had stabbed Galdarisi, he said that "it happened so fast" and "I don't know what
5  happened."  When Batemon asked where the knife was, McCaskill said that "it's taken care
6  of" and not to worry about it.  McCaskill did not make any claim that Galdarisi had a knife or
7  any other weapon.  Maberry testified that McCaskill boasted to the women that Galdarisi "did
8  not get the best of him" and that McCaskill "did not have any marks" on himself.  Batemon
9  similarly testified that McCaskill bragged that "he beat the hell out of Joe."  This boasting
10 made Maberry sick to her stomach.[27]

11     McCaskill asked the women to lie, to say that he was not there during the fight, and to
12 make up a description of a fictitious person instead.[28]

13     Maberry acknowledged on cross-examination that when she told McCaskill that she
14 thought that Galdarisi was dead, his demeanor changed.  She also acknowledged that
15 McCaskill said at one point "he kept pumping me, he kept pumping me, the next thing I know
16 I stabbed him."  Batemon similarly testified that she did not think that McCaskill realized that
17 he had killed Galdarisi before they told him that they thought he had.[29]

18     McCaskill still was wearing the same clothes that he had on at the time of the fight.
19 The three went to Batemon's grandmother's home, and McCaskill changed into different
20 clothes.  Batemon testified that McCaskill asked her for clothes to change into.  Batemon
21 noticed blood on McCaskill's pants, however later forensic testing reflected that it was his own
22 blood.  The pants were put in a garbage can outside.  Batemon testified that it was
23

---

24     [26]#66, Ex. 69, at 63-65 & 113-16 (Maberry); *id.*, at 157 (Batemon); *id.*, Ex. 70, at 192 (same).

25     [27]#66, Ex. 69, at 65-72, 116 & 126-27 (Maberry); *id.*, at 158-62 (Batemon); *id.*, Ex. 70, at 193 & 201
26 (same).

27     [28]#66, Ex. 69, at 68 (Maberry); *id.*, at 160-61 (Batemon).

28     [29]#66, Ex. 69, at 118-19 (Maberry); *id.*, at 157-58 (Batemon); *id.*, Ex. 70, at 193 (same).

McCaskill's idea to put the pants in the garbage can.  #66, Ex. 69, at 72-77 (Maberry); id., at 162-65 (Batemon); id., Ex. 70, at 173-76, 194-97 & 210-12 (same); id., at 348-49 (forensics).

Maberry testified that she did not see any injuries, although there was a red mark or spot on McCaskill's forehead, with no lesion or bleeding.  She acknowledged that she had testified at the preliminary hearing that "[h]is forehead seemed a little red, and I thought maybe there was a cut there."  Batemon testified that McCaskill had a red bump on his forehead but that it was not an open wound with bleeding.  She further saw a band-aid on his thumb.  When she asked McCaskill how he hurt his thumb, he just said that he had cut himself.  She did not see any other injuries on him.[30]

While they were at the grandmother's home, Maberry and Batemon heard McCaskill's end of a telephone call that he made to Catina Murphy.  McCaskill previously had told Maberry that he had told Murphy to say that he had been in California visiting his son.  In the subsequent telephone call, McCaskill told Murphy that if the police showed up to tell them instead that he had arrived home at about 10:00 p.m. after the monster truck event and that McCaskill and Murphy then had spent the time thereafter together.[31]

After the call, McCaskill again asked Maberry to lie for him to cover up his killing of Galdarisi.  He asked her to "please have my back on this," and that if she did so, he would "have her back" on anything.  He referred to needing to be there for his son, and he stated that "there's no reason for both of their lives . . . to be over with," referring to himself and Galdarisi.[32]

McCaskill returned to Catina Murphy's home about 2:00 a.m.  He was upset, and he was wearing different clothes.  Murphy did not see any cuts or bruises on McCaskill's face or body.  She later stated to the police that he appeared to be "in shock," but she said this during an interview in which she lied for McCaskill.  #66, Ex. 70, at 228-31, 244, 251-52 & 255-56.

---

[30]#66, Ex. 69, at 116-17 (Maberry); id., Ex. 70, at 176-77, 196 & 202 (Batemon).

[31]#66, Ex. 69, at 78-80 (Maberry); id., at 166-67 (Batemon); id., Ex. 70, at 172-73 (same).

[32]#66, Ex. 69, at 80-81 (Maberry).

1    Murphy testified that at this juncture McCaskill asked her to lie to the police and tell
2    them that he had been with her continuously after 10:30 p.m.[33]

3    Murphy saw that McCaskill had his knife when he left for the monster truck show, but
4    he did not have it with him when he returned in the early morning hours.  He told her that he
5    threw it away in some bushes so that no one would be able to find it.[34]

6    The police arrived at Murphy's home the next morning at 8:45 a.m.  The phone rang,
7    but McCaskill and Murphy did not answer it.  Murphy heard a knock on the door, looked out
8    the window, and saw the police.  She came downstairs, answered the door, and stepped
9    outside.  McCaskill, however, did not come down until "around five minutes" later.[35]

10    When Murphy was interviewed by the police, she lied as McCaskill had asked her to
11    do and told the police that he was with her continuously after 10:30 p.m. the night before.[36]

12    At trial, McCaskill's testimony specifically in support of his self-defense defense, in
13    pertinent part, consisted of the following, for the less than two minutes after the women went
14    back in the house:

15    Q:    And you don't recall who swung the first swing at
           that time?

16

17    A:    Oh, he did. He came at me to fight. That's why I
           backed up into position and we started to fight
18         again.  And at some point, I am losing balance.  I
           am on the ground and he does not allow me to get
19         back up off the ground. He goes to kick me while
           I am on the ground.  And I move where it would
20         have been my jaw at the time and it ends up being
           part of my shoulder.  And I ended up spinning
21         around on the ground. And from the point that I
           came back up, I did not believe this man was going
22         to stop. I believed that he was going to -- once I'm
           past the point of unconsciousness, he is not going
23         to stop. He is in a rage.  At that time I was scared.
           And I came up off the ground and I had a knife right

24   _____

25   [33]#66, Ex. 70, at 230 (Murphy).

26   [34]#66, Ex. 70, at 233-34 & 247-48.

27   [35]#66, Ex. 70, at 234-36 & 248-50.

28   [36]#66, Ex. 70, at 230-31.

here on my pocket. And I brought that knife out and he did not give me any time to aim, to get fully up off the ground, to stand fully erect. So I started swinging.  I remember swinging one, two, three, four and he is still on me. He still took a couple other swings.

. . . . .

Q:    Did you have any reason to believe he was not going to stop?

A:    Yes, I felt he was in a rage at that point.  He was blacked out and there was just no stopping the guy.

Q:    Did you see his face?

A:    Yeah, I can see his face.

Q:    What did you observe in his face?

A:    I could see anger.  I could see nothing but anger.

#66, Ex. 71, at 469-70.

McCaskill referred back to a prior incident when he was "jumped" by – three – men. He maintained that, in that prior incident, he sustained "three ribs or two ribs broken," a big cut on his lip, and "plenty of bruises and stuff."  He maintained that "if it wasn't for somebody coming out there and also getting some damage, they would have killed me."[37]

McCaskill maintained that he did not know that Galdarisi was dead or dying when he left.  He maintained that after stabbing a man who then fell to the ground at the very least unconscious, he left because he had a bench warrant for a traffic offense.[38]

McCaskill differed with the testimony of the women as to the particulars of the leadup to the fight after he arrived at Maberry's home, whether he was hit with the Pepsi can, whether it was his idea to change his clothes, specifically where (but not that) he asked Maberry and Batemon to lie to the police, and other details.  He maintained that Maberry and Batemon "had their . . . reasons" to lie at trial and were "trying to cover their own butt" in some

_____

[37]#66, Ex. 71, at 456 & 470-71.

[38]#66, Ex. 71, at 462, 473-74 & 487-88.

-12-

unspecified sense.  He conceded that Murphy and Cox had no reason to lie.  Moreover, he did not dispute that Galdarisi had no knife or other weapon, that Galdarisi told Maberry inside the house that they were going outside just to talk, that McCaskill swung his knife at least twice, that he knew that he had stabbed Galdarisi when he left, that the first thing that he did after he sped away was get rid of the knife that he used to stab Galdarisi, that he did in fact change out of the clothes that he wore when he stabbed Galdarisi, that he asked the women to lie to the police, and that he initially lied to the police, purportedly to "stall" the police.[39]

The police found Galdarisi's body laying face up with his head slightly under the rear bumper of his car and his arms outstretched over his head with the backs of both hands to the ground.  The position of his body was consistent with Galdarisi having fallen backwards with his arms stretched over his head, possibly hitting his head or a hand on the car bumper on the way down.  The position of the body observed by the police also was consistent with the accounts of Maberry, Batemon, and a passerby who saw the body and also called the police.  The passerby testified that the body was in the same position as when he first saw it when the police secured the scene.[40]

Amongst other blood stains found at the scene, blood on the rear bumper was consistent with Galdarisi falling backward and possibly striking the bumper with his head or a hand on his way to the ground.  A large amount of blood was present on the body and at the scene, with the front of Galdarisi's t-shirt being completely saturated with blood.[41]

Galdarisi was killed by a stab wound that "went straight in" and penetrated his heart. He sustained one other cutting injury to his left flank from a superficial slashing wound that would not have been fatal.  Galdarisi died specifically from cardiac tamponade, when blood filled the space immediately around his heart and caused it to stop pumping.  #66, Ex. 70, at 359-65 (forensic pathologist); *id.*, Ex. 71, at 385, 397-98 & 419-20 (same).

---

[39]#66, Ex. 71, at 464-69, 474-81, 484, 486, 488-95 & 498-509.  See also *id.*, at 509-19 (lies to police).

[40]#66, Ex. 70, at 281-86 (passerby); *id.*, at 290-91 & 295 (detective).

[41]#66, Ex. 70, at 292, 299-300, 303-04, 315-17, 334-35 (detective).

1    There additionally were one or two areas of scrapes and bruising on Galdarisi's

2    abdomen that possibly could have been made from the tip of a knife scraping across his body

3    but being impeded by clothing.[42]

4    There were no abrasions or cuts to the knuckles of Galdarisi's right hand, and there

5    were only minor possible abrasions or scrapes on the knuckles of his left hand.  Such

6    abrasions possibly could have been caused by striking or punching someone, but they also

7    could have been caused by Galdarisi striking the car with the back of his hand as he fell.[43]

8    The forensic pathologist who performed the autopsy also observed redness on the

9    back of Galdarisi's hands.  He attributed this to a post-mortem artifact, specifically from blood

10   settling due to gravity as Galdarisi's body lay on the ground with his arms outstretched over

11   his head and the backs of his hands to the ground.  Consistent with this finding, he noted

12   areas of blanching on the knuckles or other areas on the back of the hand where the pressure

13   of an area being in contact with the ground instead would displace the otherwise settling

14   blood.[44]

15    Indeed, the forensic pathologist testified that the redness on the left knuckles that he

16   also identified as possibly scrapes or abrasions instead may have represented only an

17   accentuation of the lividity or settling of the blood post-mortem.[45]

18    It was the opinion of the forensic pathologist that the minor findings that he observed

19   to the left hand were not indicative of a prolonged or violent fistfight.  He testified that it was

20   unlikely that the minor findings noted on the left hand were consistent with someone using the

21   hand to punch someone with a great amount of force.[46]

22   / / / /

23

24   [42]#66, Ex. 71, at 379, 384 & 400-01.

25   [43]#66, Ex. 70, at 365-67; *id.*, Ex. 71, at 406-07, 413-17 & 422.

26   [44]#66, Ex. 70, at 367-69; *id.*, Ex. 71, at 385-88.

27   [45]#66, Ex. 71, at 385-89.

28   [46]#66, Ex. 70, at 367.

1    The forensic pathologist acknowledged that punching someone in the stomach, biceps,
2    or other soft tissue "possibly" would not bruise the knuckles or leave any redness.  He further
3    acknowledged that certain bruises depicted in pictures -- which had been  taken of McCaskill
4    approximately fourteen hours after the killing -- also "possibly" could have resulted from
5    punches that might not bruise a puncher's knuckles.  He further testified on redirect, however,
6    that the bruises shown in the pictures also could have been caused by the individual
7    squeezing their own arms very tightly.  Moreover, the pictures were of fresh bruises that could
8    have been produced less than eight hours before the pictures were taken, and there would
9    have been prior manifestation of the bruising on the skin.  Bruises would not simply have
10   appeared from previously normal-appearing skin nine or ten hours after the offense with no
11   prior indication.  Furthermore, even if the bruising of the biceps resulted from being punched,
12   such punches to the biceps would not have been life-threatening.[47]

13       The forensic pathologist reiterated on redirect his opinion that the minor findings
14   observed on Galdarisi's left hand were not indicative of a prolonged or violent fist fight.[48]

15                                    ***Standard of Review on the Merits***

16       The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly
17   deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which
18   demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*,
19   131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court
20   may not grant habeas relief merely because it might conclude that a decision was incorrect.
21   131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the
22   decision: (1) was either contrary to or involved an unreasonable application of clearly
23   established law as determined by the United States Supreme Court based on the record
24   presented to the state courts; or (2) was based on an unreasonable determination of the facts
25   in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

26   ───────────────

27       [47]#66, Ex. 71, at 401-06, 412-14 & 423-27.  See also *id.*, at 440-45 (re: taking of the pictures).

28       [48]#66, Ex. 71, at 414.

                                            -15-

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.*, *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

-16-

1    Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct

2    unless rebutted by clear and convincing evidence.

3    The petitioner bears the burden of proving by a preponderance of the evidence that

4    he is entitled to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

5                                    ***Discussion***

6    ***Ground 1:  Sufficiency of the Evidence***

7    In Ground 1, petitioner alleges that there was insufficient evidence to sustain his

8    conviction, contending that the evidence was consistent with self-defense rather than second-

9    degree murder.

10   On direct appeal, the Supreme Court of Nevada rejected the claim presented to that

11   court on the following grounds:

12
13            .  .  .  McCaskill contends that insufficient evidence
     supported his conviction for second-degree murder with the use
     of a deadly weapon.  Instead, McCaskill contends that the jury
14   should have found that he lawfully acted in self-defense when he
     stabbed and killed Galdarisi.

15
16            This court reviews a challenge to evidence supporting a
     conviction for "'whether, after viewing the evidence in the light
     most favorable to the prosecution, any rational trier of fact could
17   have found the essential elements of the crime beyond a
     reasonable doubt.'"  Issues concerning the weight and credibility
18   of conflicting witness testimony, including the testimony of the
     defendant himself, are within the sound province of the jury and
19   will not be disturbed on appeal so long as the verdict was
     supported by substantial evidence.

20
21            Murder is defined as "the unlawful killing of a human being,
     with malice aforethought."  Those acts of murder which do not
22   constitute murder in the first degree are murder in the second
     degree.   The malice necessary to support a second-degree
     murder conviction is implied "'when no considerable provocation
23   appears, or when all the circumstances of the killing show an
     abandoned and malignant heart."  Malice aforethought may be
24   inferred when the defendant intentionally uses a deadly weapon
     to commit the killing.

25
26            Here, undisputed evidence was presented to the jury that
     McCaskill stabbed Galdarisi twice with a knife during an
27   altercation that began as an argument and turned into a fistfight
     between the two men.  One of these two stab wounds pierced
28   Galdarisi's heart, causing his death.

McCaskill testified in his own defense at trial and admitted that he stabbed Galdarisi. McCaskill, however, claimed that he stabbed Galdarisi in self-defense. NRS 200.200 provides that a lawful killing in self-defense occurs when

> 1.  [t]he danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and

> 2. [t]he person killed was the assailant, or ... the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

The defendant's fear of death or bodily harm must be reasonable.

Although there was testimony that Galdarisi was in a rage and aggressive once the fight began, there was also testimony that McCaskill was equally in a rage and aggressive during the fight and that he was the initial aggressor provoking the altercation. The evidence before the jury suggested that both men voluntarily engaged in the fight. McCaskill, however, was the only man who entered the fight with a weapon – a knife.

McCaskill claimed that he stabbed Galdarisi out of fear; however, other witness testimony was that McCaskill "snapped" when an empty soda can was thrown minutes before Galdarisi was fatally stabbed.  There was no evidence that McCaskill ever attempted to physically retreat from the fight, despite multiple opportunities to do so. There was no evidence that Galdarisi ever possessed or threatened McCaskill with any weapons. McCaskill even admitted that Galdarisi did not threaten him with any weapons that night. Nor was there any evidence that McCaskill was seriously injured by Galdarisi. Rather, McCaskill suffered what appeared to be only minor bruises and a cut on his thumb during the fight, which may have well been the result of McCaskill's use of his own knife.

Additionally, McCaskill's actions after stabbing Galdarisi, although not dispositive proof of guilt in themselves, were inconsistent with someone who had acted in self-defense.  After stabbing him, McCaskill left Galdarisi lying on the ground by a car and bleeding and made no attempt to contact the police or seek medical help. McCaskill disposed of the knife and later changed his bloody clothes, attempting to dispose of them as well. Witnesses testified that McCaskill bragged about both the fight and stabbing Galdarisi. McCaskill also attempted to convince three people to lie to the police on his behalf, and initially lied to the police himself about the incident.

Given McCaskill's initial aggression toward Galdarisi, the absence of serious physical injury to McCaskill or evidence that Galdarisi was armed, and McCaskill's behavior after the stabbing, a reasonable jury could have found McCaskill's claim that he

> acted in self-defense to be unreasonable and unjustified under the law. Based on the evidence above, a reasonable jury also could have found beyond a reasonable doubt that McCaskill acted with the implied malice necessary to support his conviction for second-degree murder with the use of a deadly weapon. We conclude that sufficient evidence supported McCaskill's conviction.

#68, Ex. 100, at 1-4 (citation footnotes omitted)(emphasis in original).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992.  Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992.  When the deferential standards of the AEDPA and *Jackson* are applied together, the question for decision on federal habeas review thus becomes one of whether the state supreme court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See,e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  Thus, when a federal court assesses a sufficiency of the evidence challenge to a state conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

At the very outset on this claim, petitioner bases his challenge to the sufficiency of the evidence on numerous materials that were not in evidence at trial, including preliminary

hearing testimony; police reports, statements, and interview transcripts; bald factual assertions made on federal habeas review without supporting record citation; and even potential evidence *excluded* at trial.  None of this material has any relevance to a challenge to the sufficiency of the evidence presented at trial.  The case long ago was tried and argued to the jury based on the evidence actually presented to the jury.   It is axiomatic that *Jackson* review is based on the same record presented to the jury, not preliminary hearing testimony, police investigative materials, excluded evidence, and most certainly not bald factual assertions made a decade later on federal habeas review.  *E.g., Jackson*, 443 U.S. at 324 ("if it is found that *upon the record evidence adduced at the trial* no rational trier of fact could have found proof of guilt beyond a reasonable doubt")(emphasis added); *Boyde v. Brown*, 404 F.3d 1159, 1168 n.8 (9th Cir. 2005).  Particularly given the doubly deferential review under *Jackson* and AEDPA, evidence neither is marshaled anew on federal habeas review nor considered *de novo* without regard to the evidence in fact presented to the jury.

Petitioner urges that the Supreme Court of Nevada made an unreasonable determinations of fact when it referred to McCaskill's "initial aggression toward Galdarisi" and stated that there was "no evidence that McCaskill ever attempted to physically retreat from the fight, despite multiple opportunities to do so."

In this regard, petitioner urges that "[t]he trial testimony . . . did not remotely unequivocally establish that Mr. McCaskill was the initial aggressor."[49]  What the Supreme Court of Nevada stated in full was as follows:

> Although there was testimony that Galdarisi was in a rage and aggressive once the fight began, there was also testimony that McCaskill was equally in a rage and aggressive during the fight and that he was the initial aggressor provoking the altercation.

#68, Ex. 100, at 3.  This description of the evidence is amply supported by the testimony of Michelle Maberry and Nikki Batemon, who testified that McCaskill provoked the fight and that both men were in a rage and aggressive after the fight began.  See text, *supra*, at 4-7.

---

[49]#54, at 9.

1    Also in this regard, petitioner urges that he tried to leave but Galdarisi threw the Pepsi

2    can at him and then lunged at him.[50]  However, what the Supreme Court of Nevada stated

3    was that "[t]here was no evidence that McCaskill ever attempted to physically retreat from the

4    fight, despite multiple opportunities to do so."  McCaskill did not physically retreat at any time.

5    Even if McCaskill, *arguendo*, stated to Batemon to get the baby and his hat because he

6    wanted to go, and the evidence was conflicting on that point, he never in fact followed through

7    on any such statement and actually physically retreated.  Having a Pepsi can thrown at him

8    did not prevent McCaskill from physically leaving, and trial evidence strongly supported a

9    permissible inference that the throwing of the Pepsi can made McCaskill angry enough to not

10   want to leave anymore, even if he *arguendo* had said that he wanted to do so in the first

11   instance.  Moreover, the jury was not required to accept McCaskill's own self-serving account

12   of the events.  While Maberry testified that Galdarisi "went after" McCaskill after throwing the

13   soft drink can, the women did not see Galdarisi ever strike McCaskill at any time, including

14   during the time that they walked back into the house after the can was thrown.  The trial

15   evidence amply supported the state supreme court's factual determination that there was no

16   evidence that McCaskill ever attempted to physically retreat, including his not walking away

17   when the women were walking back inside.  The trial evidence, again, instead supported a

18   permissible inference that McCaskill did not attempt to walk away at that point because he

19   was too angry to do so after Galdarisi threw the Pepsi can.[51]

20       The state supreme court's decision accordingly was not based upon an unreasonable

21   determination of fact.

22       The state supreme court otherwise did not unreasonably apply the *Jackson* standard.

23   Petitioner contends that the trial testimony "hues more closely" to self-defense than second-

24   degree murder and that his testimony that he feared for his life was unrebutted.  However,

25   again, *Jackson* review is not a *de novo* review where competing inferences are reweighed by

26

27       [50]#54, at 9.

28       [51]See text, *supra*, at 6-7.

the federal habeas court.  Nor was the jury required to accept McCaskill's self-serving testimony as true, whether directly "rebutted" or not.  There was evidence before the jury, *inter alia*, that McCaskill himself had "snapped" after Galdarisi threw the Pepsi can, that he drew his knife and stabbed the indisputably unarmed Galdarisi less than two minutes after the women went inside, that he did so without having sustained any physical injury of note and without any forensic evidence reflecting that Galdarisi was "pummeling him,"[52]  that he fled the scene immediately after purportedly having acted in self-defense purportedly due to a concern over a bench warrant over a traffic ticket, and that he thereafter sought to cover up his purportedly justifiable homicide.  Even McCaskill's own self-defense testimony was on its face extremely tenuous, as McCaskill essentially relied on his entirely self-serving assertion that he feared for his life with very little described action in the way of a purported "fight to the death" prior to his stabbing Galdarisi while allegedly rising onto his feet.  Nor did allegedly being attacked, and injured, by three men at a prior time provide justification for killing anyone that McCaskill ever got into a fight with thereafter.  There was ample evidence from which a jury could find beyond a reasonable doubt that McCaskill stabbed the unarmed Galdarisi in anger, not in self-defense.  The state supreme court's rejection of this claim clearly was not an unreasonable application of *Jackson*.

Ground 1 therefore does not provide a basis for federal habeas relief.[53]

---

[52]#54, at 9.  The forensic evidence similarly belies rather than supports petitioner's assertion in the federal reply that McCaskill did not use the knife "until he was being severely beaten" by Galdarisi.  #90, at 4.  There simply was no forensic evidence on either Galdarisi's body – such as significant forensic findings on his knuckles – or McCaskill's body – such as significant injury – of such a severe beating occurring before McCaskill pulled his knife within less than two minutes and stabbed the unarmed Galdarisi through the heart.

[53]There in truth is no need to expressly address each and every one of the subsidiary factual points argued by petitioner, which essentially beg the question.

For example, whether the Pepsi can was or was not nearly full and/or whether the can did or did not hit McCaskill is immaterial.  While the throwing of the can may have enraged McCaskill, the soft drink can never put McCaskill in peril for his life.  The soft drink can, which then was lying on the ground, certainly did not put McCaskill in peril for his life when McCaskill pulled his knife and stabbed Galdarisi through the heart.  Galdarisi, in hindsight, perhaps made the mistake of bringing a Pepsi can to what he did not know was a knife fight, but his throwing a Pepsi can at McCaskill hardly provided McCaskill with justification for stabbing him

(continued...)

***Ground 3:  Lesser Offense Transition Jury Instruction***

In Ground 3,[54] petitioner alleges that he was denied his right to due process when the trial court gave an allegedly improper jury instruction on the transition to lesser included offenses.  Petitioner contends that the jury instruction was an impermissible "acquittal first" instruction, *i.e.*, one that required the jury to unanimously agree to acquit on the greater charge before the jury could consider a lesser included offense.  Petitioner acknowledges that alleged jury instruction errors usually constitute only a matter of state law error not cognizable on federal habeas review.  He contends, however, that the alleged error so infected the entire trial with error as to deprive him of due process.

Jury Instruction No. 15 provided for the transition of the jury's consideration from first-degree murder to second-degree and thereafter to voluntary manslaughter and involuntary manslaughter.  The pertinent language used for each of the three transitions was the same, as exemplified by the language for the transition from first to second-degree murder:

---

[53](...continued)
through the heart two minutes later.  McCaskill's guilt or innocence did not turn on how many ounces of soft drink were left in the can or whether the can hit him or instead only Maberry.  See also #66, Ex. 70, at 296-97; *id.*, Ex. 71, at 435 (Pepsi can evidence contrary to petitioner's subsidiary factual position).

Similarly, focusing on McCaskill allegedly being sarcastic rather than angry inside the house does not help McCaskill's case.  Maberry's testimony that McCaskill was sarcastic when stating that the men could "deal with it," "like there was something behind it," tends to support a permissible inference of calculated aggression by McCaskill.  Whether McCaskill was angry, sarcastic, or, as the trial testimony actually reflects, both, the trial evidence clearly supported a permissible inference that he was the primary verbal aggressor inside Maberry's house.  A collateral dispute over whether he was sarcastic or angry or both is immaterial.

Moreover, while petitioner posits that he weighed 165 pounds at the time, this assertion was supported only by his trial testimony, which the jury was not required to accept at face value, as McCaskill had every reason to exaggerate the size difference.  His assertion that Galdarisi was taller also is belied by rather than supported by the trial record.  See text, *supra*, at 4.  In all events, even if Galdarisi outweighed McCaskill by twenty to thirty pounds, the jury permissibly could infer from the evidence at trial that McCaskill stabbed Galdarisi in anger rather than in self-defense.  Merely because one man in a fist fight is larger than the other does not provide the other man justification for stabbing the other man in the fight.

In the final analysis, the resolution of all such competing factual arguments and inferences from conflicting evidence, including those considered but not specifically expressly discussed herein, remain the province of the jury under the *Jackson* standard.

[54]*Inter alia*, Grounds 2 and 7 through 11 have been dismissed as unexhausted.

> You should first examine the evidence as it applies to Murder in the First degree.  If you unanimously agree that the defendant is *guilty* of Murder in the First Degree, you should sign the appropriate Verdict form and request the bailiff to return you to court.
>
> *If you can not agree* that the defendant is *guilty* of Murder in the First Degree, you should then examine the evidence as it applies to Murder in the Second Degree.  If you unanimously agree that the defendant is *guilty* of Murder in the Second Degree, . . . .
>
> . . . . .
>
> The defendant, of course, can be found Not Guilty of all the offenses enumerated.

#66, Ex. 74, Instruction No. 15 (emphasis added).

On the state post-conviction appeal, the Supreme Court of Nevada rejected a related claim of ineffective assistance of counsel on the following grounds:

> First, appellant claims that trial counsel was ineffective for failing to object to jury instructions guiding the transition from consideration of the primary offense to lesser-included offenses. Specifically, appellant claims that the district court erred in giving an "acquittal first" instruction rather than an "unable to agree" instruction.  Appellant also claims that appellate counsel was ineffective for failing to challenge the instruction on appeal. Appellant failed to demonstrate that trial counsel's performance was deficient.  In *Green v. State*, we adopted the "unable to agree" approach to transition instructions and precluded the use of the "acquittal first" instruction.  *Our review of the record reveals that the jury was given an appropriate "unable to agree" instruction.*  Likewise, because appellant thus failed to demonstrate that this claim had a reasonable probability of success on appeal, appellant failed to demonstrate that appellate counsel's performance was deficient.  Therefore, the district court did not err in denying this claim.

#71, Ex. 144, at 3-4 (emphasis added)(footnotes omitted).

Ground 3 does not provide a basis for federal habeas relief, whether under deferential AEDPA review or *de novo* review.[55]

---

[55]Respondents have not challenged the exhaustion of the underlying substantive claim, suggesting that the claim possibly was raised on the state post-conviction appeal but not explicitly addressed by the state supreme court.  In all events, the Court reaches the same conclusion on either deferential or *de novo* review, without regard to whether or not the underlying substantive claim was implicitly rejected on the merits.

1    Whether this claim is reviewed *de novo* or on deferential review, the Supreme Court

2  of Nevada remains the final arbiter of Nevada state law.  The state supreme court's holding

3  that there was no state law error wholly undercuts the necessary prerequisite for petitioner's

4  federal due process claim.  That is, there is no predicate state law error for a federal due

5  process claim, even assuming, *arguendo*, that a state law instructional error in this particular

6  regard would have given rise to a due process violation.

7    In *Green v. State*, 119 Nev. 542, 80 P.3d 93 (2003), the Supreme Court of Nevada

8  rejected the use of an "acquittal first" transition instruction and approved the use of an "unable

9  to agree" transition instruction.

10    The disapproved "acquittal first" instructions given by the district court in *Green* read

11  in pertinent part as follows:

12    In order to find the defendant guilty of the lesser [offense]
      . . . , you must *unanimously agree* that the accused did *not*
13    [commit the greater offense].

14    . . . .

15    After you have unanimously agreed that the defendant is
      *not* guilty of [the greater offense], you then must determine
16    whether or not the defendant is guilty of the lesser included
      [offense].  If you unanimously agree that the defendant is guilty
17    of [the lesser offense], you will sign and date the verdict form
      provided and present it, *and your not guilty verdict* for the [greater
18    offense] to the court.

19    . . . . .

20    You will note from this instruction that you must
      unanimously agree that the defendant is *not* guilty of the charged
21    crime before you may find the defendant guilty or not guilty of any
      lesser charge.

22  119 Nev. at 546-47, 80 P.3d at 96 (emphasis added).

23    *Green* instead approved "unable to agree" instructions such as had been approved

24  previously by state courts in Arizona, Hawaii and Oregon.  119 Nev. at 547, 80 P.3d at 96.

25  An example of such a charge in a Hawaii case cited in *Green* provided in pertinent part:

26    If you cannot unanimously agree on a verdict on the
      charge of [the greater offense] then you may consider whether
27    [the defendant] committed the [lesser] offense . . . .

28  *State v. Ferreira*, 8 Haw.App. 1, 3, 791 P.2d 407, 408 (1990).

-25-

1       Accordingly, over and above the fact that the Supreme Court of Nevada is the final

2   arbiter of Nevada state law, it is clear that the instruction given in McCaskill's case was the

3   *approved* "unable to agree" instruction and not the *dis*approved "acquittal first" instruction.

4   The charge in this case instructed the jury to enter a verdict on the greater offense only if they

5   could unanimously agree that petitioner was *guilty* of the greater offense.   It did not instruct

6   the jury impermissibly under Nevada law that it could consider the lesser offense only if jurors

7   unanimously agreed that petitioner was *not* guilty.   Rather, if the jurors were unable to agree

8   on a verdict on the greater offense, they then could consider the lesser offense, without any

9   requirement stated that they first much reach unanimous agreement as to an acquittal on the

10   greater offense.   The charge in this case was an "unable to agree" instruction, not an

11   "acquittal first" instruction.   Petitioner calling one thing the other does not make it the other.

12   This claim lacks any legal or factual foundation, whether on *de novo* or deferential review.

13       Ground 3 does not provide a basis for federal habeas relief.

14   **Ground 4:   Comment Upon Invocation of Fifth Amendment Rights**

15       In Ground 4, petitioner alleges that his "constitutional rights" under the Fifth, Sixth and

16   Fourteenth Amendments were violated when the State commented upon his invocation of his

17   Fifth Amendment rights.[56]

18       While McCaskill was testifying on direct examination at trial, he unilaterally testified that

19   he requested counsel and thereby terminated the first police interview and that he invoked

20   his right to be silent on the advice of counsel thereby terminating a second interview.   Neither

21   response was called for by the question asked by his counsel.[57]   On cross-examination, the

22   prosecutor asked two short questions confirming that the officer promptly terminated the first

23   interview after McCaskill requested counsel.   The thrust of the examination that followed

24   focused on the fact that petitioner lied to the police when he did talk, not that he invoked

25   either his right to be silent or his right to counsel.   #66, Ex. 71, at 496-98.   Thereafter, during

26

27       [56]Misconstruing the screening order, petitioner divided this single claim into two subparts.

28       [57]#66, Ex. 71, at 479-81.

a detective's rebuttal testimony, the prosecutor referred in the preface to a question that "his request for a lawyer has already come out in court" and that the detective was "permitted to comment on it."  The line of inquiry, however, did not delve into any discussion of either petitioner's request for counsel or his election to remain quiet, focusing again on the point that McCaskill lied to the police in what he did say.[58]

On state post-conviction review, petitioner raised a related claim of ineffective assistance of counsel.   The state district court appointed counsel and conducted an evidentiary hearing.  One of the defense co-counsel testified at the hearing that he did not believe that defense counsel objected to the State's reference to petitioner's invocation of his Fifth and Sixth Amendment rights because his "understanding was that Mr. McCaskill brought it up himself, and so that kind of opened the door." The other co-counsel similarly testified that "he said it on his own."[59]   The state district court found that "[t]he trial record reveals that McCaskill himself was the first to mention that he had demanded counsel."[60]

On the state post-conviction appeal, the Supreme Court of Nevada, in pertinent part, held as follows in the course of discussing a related claim of ineffective assistance of trial counsel:

> . . . . At trial, appellant took the stand in his own behalf and during direct examination mentioned that he had invoked his right to counsel.  Review of the trial transcript, the evidentiary hearing in the district court, and the district court's findings of fact reveals that trial counsel did not suggest that appellant comment on his invocation of the right to counsel but that appellant "said it on his own." To the extent that appellant complains of trial counsel's failure to object to cross-examination, we note that appellant "opened the door" in this regard and thus it is not reasonably probable that trial counsel's objection would have been sustained. Further, appellant failed to demonstrate that an objection would have had a reasonable probability of leading to a different outcome at trial.

#71, Ex. 144, at 4 (footnote omitted).

---

[58]#66, Ex. 71, at 510-15.

[59]#70, Ex. 121, at 36 & 54-55.

[60]#70, Ex. 127, at 3.

1    Ground 4 does not provide a basis for federal habeas relief, whether under deferential

2    AEDPA review or *de novo* review.[61]

3    Petitioner urges that "[t]he prosecutor was present for the exchange [on direct

4    examination of McCaskill] and presumably observed that trial counsel opened the door, not

5    McCaskill."[62]  This assertion flies in the face of factual determinations both by the state district

6    court and the Supreme Court of Nevada to the contrary.  These factual determinations are

7    amply supported by the record and are entitled to a presumption of correctness on federal

8    habeas review, even on *de novo* review otherwise as to the law.  Moreover, the trial transcript

9    reads the same way to this Court, as it is evident that McCaskill's references to requesting

10   counsel and to electing to remain silent were not responsive to the questions asked by his

11   seasoned defense counsel at trial.  It was McCaskill's own on the one hand overly ebullient

12   and on the other nonresponsive answers to questioning – evident throughout his testimony

13   on both direct and cross-examination – that led to his unilaterally making references to

14   requesting counsel and electing to remain silent.[63]

15   Against that backdrop, petitioner cites no apposite law establishing that the relatively

16   innocuous passing references by the prosecutor to what McCaskill already had himself said

17   from the stand deprived petitioner of a fundamentally fair trial or otherwise violated his

18   constitutional rights.  The decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), is not apposite to

19   the circumstances presented in this case.  In *Doyle*, it was the prosecutor who broached the

20   topic of the defendants having invoked their right to be silent, and he did so in a manner that

21   sought to draw a negative impeachment inference from the defendants' election to remain

22

23           [61]Respondents have not challenged the exhaustion of the underlying substantive claim, apparently on
24   the basis that the claim was raised on the state post-conviction appeal but not explicitly addressed by the
     state supreme court.  In all events, the Court reaches the same conclusion on either deferential or *de novo*
25   review, without regard to whether or not the underlying substantive claim was implicitly rejected on the merits.

26           [62]#54, at 16.

27           [63]See also #70, Ex. 121, at 39-40 & 54 (corresponding testimony by both defense co-counsel at the
     state post-conviction evidentiary hearing concerning McCaskill's penchant for giving nonresponsive answers
28   despite the advice and efforts of counsel prior to trial in attempting to prepare McCaskill for taking the stand).

1  silent.  Here, McCaskill himself broached the topic, and the prosecutor did not seek to draw
2  a negative inference from either election rather than from McCaskill's lies to the police.

3  The present case also does not turn upon the principle that a defendant may invoke
4  the right to remain silent even after starting to make a statement.  That principle was honored
5  in this case, as the police terminated the interviews promptly once petitioner invoked his right
6  to counsel or to remain silent.  At issue in this case, in contrast, is whether, once McCaskill
7  himself opened the door and referred at trial to his request for counsel and election to remain
8  silent the prosecutor's again relatively innocuous references thereafter deprived him of his
9  constitutional rights.  The Court holds that they did not.

10  Ground 4 therefore does not provide a basis for federal habeas relief.

11  ***Ground 5:  Effective Assistance of Trial Counsel***

12  In Ground 5, petitioner alleges that he was denied a right to effective assistance of trial
13  counsel in violation of the Sixth and Fourteenth Amendments.  He alleges multiple distinct
14  instances of alleged ineffective assistance, which are discussed in more detail below.

15  On a claim of ineffective assistance of counsel, a petitioner must satisfy the
16  two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate
17  that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)
18  counsel's defective performance caused actual prejudice.  On the performance prong, the
19  issue is not what counsel might have done differently but rather is whether counsel's
20  decisions were reasonable from his perspective at the time.  The  court starts from a strong
21  presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the
22  prejudice prong, the petitioner must demonstrate a reasonable probability that, but for
23  counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*
24  *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

25  While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review
26  is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court
27  must take a "highly deferential" look at counsel's performance through the also "highly
28  deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

-29-

### Ground 5(a/b):  Failure to Seek Different Transition Instruction

In Ground 5(a/b),[64] petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to request a proper "unable to agree" transition instruction in lieu of an improper "acquittal first" transition instruction allegedly given at trial.  As discussed as to Ground 3, *supra*, the underlying substantive claim is wholly flawed both factually and legally.  As both the state supreme court and this Court have held, the transition instruction given at petitioner's trial *was* an "unable to agree" instruction.  This related claim of ineffective assistance of counsel thus also is flawed both factually and legally.  Moreover, trial counsel would not have had the benefit of the *Green* state case at trial, as it was decided well after trial.  Ground 5(a/b) accordingly does not provide a basis for federal habeas relief.

### Ground 5(c/d):  Protection of Invocation of Fifth Amendment Rights

In Ground 5(c/d), petitioner alleges that he was denied effective assistance of counsel when trial counsel failed to protect the invocation of his Fifth Amendment rights, in regard to the circumstances discussed as to Ground 4.

The Supreme Court of Nevada held that petitioner failed to demonstrate that counsel's performance was deficient or that he was prejudiced, for the reasons quoted in the discussion previously in Ground 4.  For substantially the reasons canvassed by this Court as to the substantive claim in Ground 4, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.  *Inter alia*, on the ineffective-assistance claim in particular, petitioner cannot demonstrate a reasonable probability of a different outcome at trial had trial counsel objected to the State's references to the invocation of rights that petitioner already himself had referenced.

Ground 5(c/d) therefore does not provide a basis for federal habeas relief.

---

[64]Petitioner misconstrued the Court's screening order to mean that a claim of ineffective assistance of counsel in violation of the Sixth Amendment must be alleged as a separate claim from the same claim under the Fourteenth Amendment.  The invocation of two constitutional amendments, particularly where one of the Bill of Rights is applied through the Fourteenth Amendment, clearly does not present two claims.  To avoid any unnecessary initial confusion on review, the Court follows this unusual labeling of the subparts, given that petitioner identifies the next in truth single subpart as Ground 5(c) and (d).

-30-

1      ***Ground 5(e):  Alleged Failure to Litigate Exclusion of Evidence of Violent Nature***

2          In Ground 5(e), petitioner alleges that he was denied effective assistance of counsel

3 when trial counsel allegedly failed to litigate the trial court's exclusion of evidence of the

4 violent nature of the victim.

5          At the outset on this claim, the Court will take up petitioner's motion (#86) for

6 reconsideration.

7          In a prior motion to dismiss, respondents moved to dismiss an independent substantive

8 claim potentially included within Ground 5(e) as procedurally defaulted, following upon the

9 state supreme court's holding in that regard on state post-conviction review.  Petitioner

10 appeared to concede in response that he was not raising a substantive claim as well.  The

11 Court found based upon this apparent concession that Ground 5(e) did not include an

12 independent substantive claim.  However, the Court allowed petitioner a limited opportunity

13 to seek reconsideration of that finding.  He since has done so.[65]

14          The Court is not inclined to grant the motion for reconsideration.

15          The Court's screening order (#48), which reflects established practice in this District,

16 clearly identified one of the principal deficiencies in the initial counseled amended petition:

17             . . . .  The pleading . . . is deficient in form in a number of
respects that must be corrected prior to directing a response.

18 While the Court is reluctant to have further delay in this case
given its age, *inter alia*, the amended petition must be presented

19 in a manner where the discrete claims presented can be identified
as such by respondents and responded to accordingly.

20                . . . . .

21             [P]etitioner must present one constitutional claim per
ground. The present pleading combines multiple claims together

22 under single grounds, *including, in particular, independent
substantive claims of trial court error with claims of ineffective*

23 *assistance of trial and/or appellate counsel*. The Court and
respondents need to be able to identify which discrete claims

24 actually are being presented. It is exceedingly difficult to ascertain
from the present pleading in all instances whether petitioner is

25 seeking to present an additional claim for relief or instead is
referring to a constitutional issue in passing as background to

26 another claim. The Court and the respondents need to be able to

27 _____

28    [65]See ## 85 & 86.

1   clearly identify what claims are being presented and what the
    specific claimed basis for exhaustion of those claims is.
2

3            Petitioner therefore must: (a) *separate all claims of*
    *independent substantive error presented from each other and*
4   *from claims of ineffective assistance of trial counsel and/or*
    *appellate counsel*; (b) present all claims of ineffective assistance
    of trial counsel under a single consolidated ground broken down
5   by subparts for each discrete claim of error (i.e., "A," "B", etc.); (c)
    similarly present all claims of ineffective assistance of appellate
6   counsel in a single consolidated ground broken down by
    subparts; and (d) identify in the pleading the specific basis for
7   exhaustion for each ground or subpart thereof. Petitioner of
    course may incorporate allegations from a prior ground in the
8   course of stating another claim or ground based in whole or in
    part on the same facts. If the amended petition filed in response
9   to this order refers in passing to other possible constitutional
    violations that are not set forth as a separate ground and for
10  which no statement of exhaustion is provided, *the passing*
    *reference will not be regarded to be a claim upon which relief*
11  *actually is being sought*.

12  #48, at 4 (emphasis added).

13       Petitioner apparently substantially complied with this provision of the screening order

14  as to all other claims in the second counseled amended petition (#54).  Throughout the

15  pleading, claims of independent substantive error are presented separately from one another

16  and from claims of ineffective assistance of trial counsel and/or appellate counsel.  And

17  petitioner conceded in the opposition to respondents' motion to dismiss that Ground 5(e)

18  similarly presented only a claim of ineffective assistance of trial counsel rather than an

19  ineffective-assistance claim combined with an independent substantive claim.

20       Even if the Court were inclined to allow this concession to be withdrawn, which it is not,

21  withdrawal of the concession merely would establish that claims were combined in Ground

22  5(e) in contravention of the screening order.  The reason for the clarity required by the order

23  was to avoid just this sort of situation in a three-plus year-old case where even petitioner's

24  counsel has been unable to consistently identify which claims are and are not presented.  To

25  the extent, *arguendo*, that Ground 5(e), which on its face is presented as a claim of ineffective

26  assistance of counsel, attempts to also include an independent substantive claim of trial court

27  error, it does so in contravention of the screening order.  Under that order, the embedded

28  reference "will not be regarded to be a claim upon which relief actually is being sought."

1    Further, in the alternative, the Court holds that any substantive claim *arguendo* properly

2    presented in Ground 5(e) is procedurally defaulted.   The only possibly viable basis to

3    overcome the procedural default of this independent substantive claim would be premised

4    upon a claim of alleged ineffective assistance of appellate counsel for failing to raise the

5    substantive claim on direct appeal.   As the Court holds with regard to Ground 6(e), *infra*,

6    petitioner cannot demonstrate ineffective assistance of appellate counsel in this regard.   He

7    therefore cannot establish cause and prejudice to overcome the procedural default of the

8    independent substantive claim.   An appellate advocate is not required to raise every

9    nonfrivolous ground that a defendant allegedly would want to pursue. *See,e.g., Jones v.*

10   *Barnes*, 463 U.S. 745 (1983).

11   The Court accordingly addresses a claim only of ineffective assistance of trial counsel

12   under Ground 5(e).

13   With regard to that claim, trial counsel did in fact actively seek to introduce evidence

14   of the alleged violent character of the victim, Joseph Galdarisi.

15   Defense counsel filed a pretrial motion to offer character evidence and prior bad act

16   evidence as to Galdarisi.   Defense counsel further filed a pretrial motion seeking disclosure

17   of any criminal records of Galdarisi.   Defense counsel additionally presented argument in

18   opposition to a State motion to exclude evidence of any specific acts of violence by Galdarisi.

19   The trial court ruled pretrial that the court would not allow introduction of evidence of any

20   specific acts unless the defendant testified that he was aware of the prior incident at the time.

21   The court further ruled that it would allow evidence as to reputation or opinion as to violent

22   character.   The court directed the State to provide the defense with a copy of a NCIC "rap

23   sheet" reflecting any prior arrests or offenses for Galdarisi.[66]

24   The State thereafter ran a rap sheet for Galdarisi and provided it to the defense.   The

25   rap sheet reflected "one or two spousal batteries" in California.  #66, Ex. 69, at 86.

26   / / / /

27   _____

28   [66]#64, Ex. 36; #65, Ex. 48; *id.*, Ex. 52 (State motion); #65, Ex. 58, at 9-22; *id.*, Ex. 59.

-33-

1    During Michelle Maberry's testimony at trial, counsel were unable to agree regarding
2    the proper scope of questioning of Maberry and possibly other witnesses as to Galdarisi's
3    alleged reputation for being mean and violent when he was angry.  The trial court heard
4    testimony from Maberry on the point outside the presence of the jury.[67]  The examination
5    culminated with the following exchange:

6        Q:    By the way, you said that in response to a leading
              question that he had a reputation for being violent
7              if provoked.  So what was his reputation, as you
              call it reputation, if he wasn't provoked?
8
         A:    He was calm.
9
         Q:    When you say he had a reputation for being violent
10             if provoked, you mean defending himself?

11       A:    *No. I mean this is not in context with men.  I'm
              talking in context with women*. His previous wives
12             would push him, and he'd say, hey, no, I need to
              back off, and he'd walk away. If they kept going at
13             him, he would hit them.  And he stated that to me
              many times, that as long as someone would just let
14             him be and walk away, he wouldn't get to that point.

15   #66, Ex. 69, at 92-93 (emphasis added).

16       The trial court excluded the proffered reputation evidence on the following ground:

17
             THE COURT: I am going to exclude the
18           evidence on the basis that I don't think it is relevant,
             the reputation of the way he treats women isn't
19           relevant to what he does with men absent some
             other showing of  - I assume you are going to ask
20           the other witnesses what they see the reputation
             as.  Maybe they didn't see it solely this way.  But
21           based on the witness's testimony and the offer to
             prove, she limited it only to women, and therefore,
22           it wouldn't be admissible.

23   #66, Ex. 69, at 97; see also *id.*, at 94-97 (related discussion).

24       McCaskill testified that Galdarisi was known to be aggressive.  He also testified that
25   he heard Maberry say he had a tendency to be violent and aggressive physically, perhaps
26   referring to her proffered testimony outside the presence of the jury.  An objection was

27   _____

28       [67]#66, Ex. 69, at 85-97.

                            -34-

sustained to a question to McCaskill seeking to establish that McCaskill had a reputation in the community as a talker whereas Galdarisi's reputation was as a doer, as to a question thus seeking testimony by McCaskill as to his own reputation.[68]

McCaskill did not provide any testimony when he was on the stand at trial that he was aware of any prior specific act of violence by Galdarisi.

At the state post-conviction hearing five years later, McCaskill maintained that he was aware of prior specific acts of violence by Galdarisi against a former wife or girlfriend because Galdarisi bragged about the incidents to McCaskill.[69]

The state district court found that McCaskill's evidentiary hearing testimony "was largely incredible" and further that the prior acts "were *not* known to the defendant."[70]

The Supreme Court of Nevada rejected the claims of ineffective assistance of both trial and appellate counsel presented to that court on the following basis:

> [A]ppellant claims that trial counsel was ineffective for failing to further litigate the district court's exclusion of evidence of the victim's violent nature. Specifically, appellant contends that trial counsel should have done more to admit testimony that on the night before the incident in question, the victim had kneed his wife in the stomach, as that was further evidence that the victim was violent and that appellant acted in self-defense. Appellant also claims that appellate counsel was ineffective for failing to raise this issue on direct appeal. Appellant failed to demonstrate that trial counsel's performance was deficient or that he was prejudiced. The record reflects that trial counsel tried twice to admit the evidence: once in a pre-trial motion and again during the testimony of Michelle Cummings [Maberry]. Therefore, inasmuch as appellant claims that trial counsel failed to pursue this issue in the district court, his claim is belied by the record. Moreover, the district court's decision was based on established Nevada law that, while evidence of a victim's violent reputation is admissible, a prior act of violence by a victim is not admissible to show the state of mind of a defendant claiming that he acted in self-defense unless the accused demonstrates that he had actual knowledge of that act. After the evidentiary hearing, the district

---

[68]#66, Ex. 71, at 472.

[69]#70, Ex. 121, at 88-90.

[70]#70, Ex. 127, at 2 & 4 (emphasis in original). Petitioner notes that the state district court made this finding "despite" his evidentiary hearing testimony, apparently proceeding on the premise that his testimony must be accepted as true by the trier of fact. That is not the law.

1
2
3
4
5
6

> court found that appellant did not know of this specific act prior to his altercation with the victim, and this finding is entitled to deference.   Accordingly, appellant failed to demonstrate a reasonable probability that had trial counsel raised this issue a third time the result would have been different. Inasmuch as appellant seeks a change in the law, we decline to revisit our prior decisions.  And to the extent that appellant claims his appellate counsel was ineffective, we conclude that appellant failed to demonstrate that this claim had a reasonable probability of success on appeal. Therefore, the district court did not err in denying this claim.

7       #71, Ex. 144, at 5-7 (footnotes omitted).

8            The state supreme court's rejection of the claim of ineffective assistance of trial
9       counsel was neither contrary to nor an unreasonable application of *Strickland*.

10           As the state high court observed, defense counsel litigated the issue, both as to
11      reputation and prior acts, extensively, and the trial court ruled against the defense.  Petitioner
12      urges that the trial court incorrectly decided the issue.  However, even if this Court were to
13      assume *arguendo* that the trial court erred in excluding the evidence – which, as discussed
14      *infra* as to Ground 6(e), would not be a correct assumption based on the record presented
15      and the governing law – any such purported error by the trial court would not establish
16      ineffective assistance by trial counsel.  Defense counsel extensively litigated the issue, and
17      lost.  There clearly was no deficient performance by defense counsel, who in fact vigorously
18      pursued the issue at the trial level.  Nor can petitioner demonstrate a reasonable probability
19      of a different outcome had defense counsel pursued the issue even more extensively after
20      the trial court considered the law and evidence and ruled against the defense.  Merely
21      because petitioner continues to disagree with the trial court's ruling does not establish a
22      reasonable probability that trial counsel could have secured a different ruling by persisting in
23      a rejected argument or arguing the rejected position differently.

24           Ground 5(e) therefore does not provide a basis for federal habeas relief based upon
25      alleged ineffective assistance of trial counsel.[71]

26      _____

27           [71]Petitioner relies upon an affidavit by Michelle Maberry that "clarified some of her testimony."  #54, at 26-27; #61, Ex. 9, at electronic docketing pages 4-5.  The September 29, 2011, affidavit in this 2008 habeas
28                                                                                                        (continued...)

1    ***Ground 5(f/g):  Alleged Motive to Fabricate Testimony by Nikki Batemon***

2    In Ground 5(f/g), petitioner alleges that he was denied effective assistance of counsel

3    when trial counsel allegedly failed to confront prosecution witness Nikki Batemon regarding

4    an alleged motive to fabricate her testimony based upon her wanting sole custody of their

5    son.

6    Co-counsel Jerome Wright testified as follows at the state post-conviction evidentiary

7    hearing:

> Q:    Do you recall any issue whether Nicky Bateman
> [sic] had a motivation to lie during her testimony
> against Mr. McCaskill?
>
> A:    I know there was an issue about custody of the
> children, so the answer to that would be yes.  In my
> opinion, it was irrelevant, because the issue was
> what happened out in the street or out in the dirt
> with Mr. McCaskill and Mr. Galdarisi.

13   #70, Ex. 121, at 46-47.  Wright continued with the point that the two women testified only as

14   to the events leading up to the final altercation, which they did not see.  He did not recall

15   whether or not he or instead his co-counsel cross-examined Batemon.  He testified, however,

16   that "I don't know that I would have examined on that [custody], being the defense was self-

17   defense, and I was hoping Mr. McCaskill could explain to the jury how he was out there in

18   self-defense."[72]

19   In his testimony at trial, McCaskill differed with Nikki Batemon's testimony only

20   regarding whether she still had feelings for him by the time of trial, regarding the exact

21   location where he asked the women to lie for him to cover up that he was the one that killed

22   Galdarisi, regarding whether he bragged about stabbing Galdarisi, and regarding whether it

---

[71](...continued)
case may not be considered because it was not presented to the state courts when they decided the claim on the merits.  *See Pinolster,* 131 S.Ct. at 1398-1401.  Moreover, trial counsel's litigation of the issue necessarily would have been based upon Maberry's testimony on the stand in 2003, not upon how she possibly might "clarify" that testimony eight years later in 2011 on federal habeas review.  *E.g., Harrington v. Richter*, 131 S.Ct. 770, 779 (2011)(reviewing court must evaluate counsel's conduct from his perspective at the time).

[72]#70, Ex. 121, at 47.

was her idea or his idea for him to change clothes.  He did not disagree with her testimony on any other point, whether as to the leadup to his stabbing Galdarisi or as to what occurred thereafter.[73]

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> Finally, appellant claims that trial counsel was ineffective for failing to cross-examine a witness about her motivation to lie at trial.  Specifically, appellant argues that trial counsel should have cross-examined Nikki Batemon, the mother of appellant's child, about custody proceedings regarding their child and Batemon's possible motivation to implicate the appellant. Appellant failed to demonstrate that he was prejudiced. First, Batemon did not testify at the evidentiary hearing on his petition, and thus appellant has failed to provide specific evidence of the testimony that would have resulted from cross-examination. Further, our review of the record reveals that Batemon was not a witness to the stabbing and that her testimony did not conflict with the appellant's in any material way. Accordingly, appellant failed to demonstrate a reasonable probability that cross-examination of Batemon on this subject would have produced a different result at trial. Finally, trial counsel testified that he was aware of appellant's custody battle with Batemon, but considered it irrelevant. To the extent that trial counsel made a tactical decision not to question Batemon about her custody battle, we note that in the context of claims of ineffective assistance of counsel, "'a tactical decision . . . is virtually unchallengeable absent extraordinary circumstances.'"  Appellant did not demonstrate extraordinary circumstances here. Therefore, the district court did not err in denying this claim.

#71, Ex. 144, at 8-9 (footnotes omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*, particularly under the doubly deferential standard of review applicable in this context.  The tactical decision by counsel to not pursue impeachment on the hardly compelling basis that Batemon would lie to convict McCaskill of potentially first-degree murder so that she could gain custody of their son is "virtually unchallengeable" under the *Strickland* standard.  *See Strickland*, 466 U.S. at 690.  The state supreme court's determination that there was not a reasonable probability that cross-examination along these

---

[73]#66, Ex. 71, at 484-85, 490-94, 499-502 & 505.

-38-

1   lines would have affected the outcome of the trial similarly was not an unreasonable

2   application of *Strickland*.  Such a method of attempted impeachment, again, hardly presented

3   a compelling attack on the witness' credibility.  While undeniably a conceivable approach to

4   challenging her motive to testify as she did, it hardly necessitated rejection of her testimony,

5   which on many points also was corroborated by Maberry's testimony.   And Batemon's

6   testimony in all events differed from McCaskill's testimony on few material points.  The state

7   supreme court accordingly quite reasonably could conclude that there was not a reasonable

8   probability that attempted impeachment on this point would have altered the outcome at trial.

9         Ground 5(f/g) therefore does not provide a basis for federal habeas relief.[74]

10        / / / /

11        / / / /

12

13   _____

14        [74]Petitioner alleges in the amended petition – with no citation to state court record support – that
     Batemon lost a "bitter battle" for custody of the son to McCaskill's mother during the pendency of the criminal
15   proceedings and that the grandmother thereafter has retained sole custody "to date."  Federal habeas review
     is limited to the record presented to the state court that decided the claim on the merits.  *Pinholster, supra*.
16   Moreover, it would appear that Batemon allegedly losing custody to Mrs. McCaskill would undercut the claim
     of a motive to fabricate, as it suggests that the outcome of the criminal trial as to Jeremy McCaskill had no
17   impact on whether Batemon could secure custody as against Mrs. McCaskill.  Such alleged facts further
     would reflect how increasingly collateral litigation of the point would have become at trial if it were delved into
18   as an attempted basis for impeachment.  Defense counsel instead focused on the central issue, pursuing a
     defense of self-defense as to an altercation that was not witnessed by Batemon, under anyone's testimony.

19
         Petitioner further suggests within Ground 5(f/g) that there were inconsistencies between Batemon's
20   police statements and her trial testimony that counsel did not pursue during cross-examination.  As discussed
     with regard to Ground 5(e), the screening order in this case clearly stated that petitioner could present only
21   one constitutional claim per ground or subpart.  A claim that counsel failed to impeach a witness' testimony
     with prior inconsistent statements is a distinct claim from a claim that counsel failed to confront the witness
22   with an alleged motive to fabricate her testimony.  As the screening order stated, any references to other
     constitutional claims within a ground would  not be regarded as presenting a claim for relief.  Even if such a
23   claim were presented herein – and exhausted – there is not a reasonable probability that cross-examining
     Batemon regarding the alleged inconsistencies in question would have changed the outcome at trial.  See
24   #54, at 27 (outlining alleged inconsistencies).  For example, the outcome in the case did not turn upon
     whether Galdarisi did or did not actually hit McCaskill with the Pepsi can.  Having thrown a Pepsi can at
25   McCaskill did not justify McCaskill stabbing Galdarisi through the heart after the can already had been thrown,
     regardless of whether or not the can hit McCaskill before then posing no threat laying on the ground.  The
26   throwing of the can may have enraged McCaskill, but it provided him with absolutely no valid basis for a self-
     defense defense.  Petitioner's focus herein on whether the soft drink can was full or empty simply is a red
27   herring.  Witnesses have varying recollections as to collateral details.  Establishing that a witness said
     something differently as to a collateral detail in a prior statement frequently does not lead to either a rejection
28   of their testimony or an acquittal.

-39-

***Ground 5(h):  Sentencing***

In Ground 5(h), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to correct an alleged misconception by the sentencing court as to the effect of consecutive sentences each of 10 to 25 years as opposed to 10 to life.

On the conviction for second-degree murder with the use of a deadly weapon, McCaskill potentially faced sentencing for either:  (a) a definite term of 25 years with the possibility of parole after a minimum of 10 years had been served, with a like consecutive sentence; or (b) a life sentence with the possibility of parole after a minimum 10 years had been served, with a like consecutive sentence.

On both possible sentencing options, McCaskill faced a minimum 20 years incarceration if institutionally paroled from the first consecutive sentence to the second once the minimum 10 years had been served on the first sentence.  The difference between the two sentencing options concerned whether he would be subject to parole supervision for life following a noninstitutional parole on the second consecutive sentence or instead only through the expiration of the second 25-year consecutive sentence.

The Department of Parole and Probation recommended the maximum sentencing option of consecutive sentences of life with the possibility of parole after 10 years on each sentence.

Defense counsel argued for the minimum consecutive 10 to 25 year sentences, *inter alia*, to give McCaskill "an opportunity to get out and get back with his son and his family."[75]

The State, in pertinent part, argued as follows:

> Your Honor, because of the good time credit he will receive in prison, if you impose the term of years he will flatten out the term either at the time he is released or very, very shortly thereafter because of the good time credits.  We want the Division  to be supervising him forever, to be checking on him occasionally to see how he is doing to make sure that once he is released and once he has paid his debt for this crime, he does not do something similar to someone else. So we think it's a very good idea to have supervision over him after he is released.

---

[75]#67, Ex. 80, at 17-18.

1

2

3

> Obviously, Your Honor, drinking had a lot to do with this event, drinking by Mr. McCaskill. And the parole authorities may have some ability to limit that or to impose appropriate conditions to stop that.
>
> . . . . .

4

5

6

7

8

9

> And again, the key to us the time actually spent is not going to be that great, although it is possible that he could spend the rest of his life in prison. But our concern is that if the parole authorities – I'm sorry, if the prison authorities do release him, we want him supervised because we believe that's the best for the community and to protect the community. So we would ask Your Honor to reject the defense suggestion and to sentence him to life imprisonment, with parole eligibility in ten years with the underlying second degree murder count and then a consecutive term of equal length for the use of the deadly weapon in the offense.

10    #67, Ex. 80, at 18-19 & 20.

11         The court thereafter stated, after McCaskill personally addressed the court:

12

13

14

15

16

17

18

> Of significance to me is the State's request for supervision after the flattening out of time in prison. Based upon the statute, Mr. McCaskill must serve a minimum of twenty years before he can be paroled. And if I give him 50 years as the top, that would be, he would be paroled without a parole tail which would also mean 20 years from now he would have no help in the community. I don't know how much parole does, but they do provide something. They do provide some support other than just putting somebody at the prison gate after twenty years with l00 bucks in their pocket. And although you have lots of family and parents now, Mr. McCaskill, twenty years from now I can't say how many, what your parents will be, what kind of condition they will be in.

19

> . . . . .

20

21

22

23

> . . . . I think that this case based on the circumstances of the case would be appropriate for a 50-year sentence, the 10 to 25, but I am concerned about the lack of a parole tail and the lack of a support group after being released from custody after so long. And everyone tells me it makes no difference if it's 25 or life in terms of parole. So, that's why I'm going to go along with the recommendation of the Division.

24    #67, Ex. 80, at 22-23.

25         On state post-conviction review and thereafter, petitioner has urged that the sentencing

26    court's statement that "it makes no difference if it's 25 or life in terms of parole" indicated that

27    the court thought that there was no difference between a determinate sentence, as to which

28    parole ultimately would end, and a life sentence, where it would not.

-41-

1    The state district court rejected the claim on the basis, first, that it did not

2  misapprehend the effect of the sentence imposed and, second, that it would have imposed

3  the same sentence as at sentencing following the argument presented on post-conviction

4  review.[76]

5    The state supreme court held that petitioner had failed to demonstrate a reasonable

6  probability of a different result at sentencing, given, *inter alia*, the district court's finding that

7  its sentence would have been the same even with the argument presented on state post-

8  conviction review.[77]

9    The state supreme court's rejection of this claim was neither contrary to nor an

10  unreasonable application of clearly established federal law.

11    The claim is fundamentally factually flawed.  The phrase taken out of context from the

12  sentencing does not reflect that the sentencing court did not understand the difference

13  between sentencing McCaskill to a determine sentence with a closed-end parole and

14  sentencing him to life with no end to parole.  Sentencing McCaskill to a sentence with parole

15  for life rather than a closed-end parole was the very *raison d'être* for the sentencing decision

16  made by the court.  The court clearly understood the difference because it was the existence

17  of that very difference that was the reason for the sentence imposed.  When the court said

18  that "it makes no difference if it's 25 or life in terms of parole" it very clearly meant in context

19  only that there was no difference if it was 25 or life in terms of *getting* parole.  That point is

20  regularly made in Nevada sentencing proceedings that the imposition of a life sentence as

21  opposed to a determinate sentence has no impact on whether an inmate will receive parole,

22  which turns instead on other factors.  As discussed at length at the sentencing hearing, the

23  critical difference in the two sentencing options was whether parole supervision would have

24  an ultimate termination point or instead be for life.  The sentencing court clearly opted for the

25  latter.

26  _____

27    [76]#70, Ex. 127, at 3.

28    [77]#71, Ex. 144, at 7-8.

-42-

1    There accordingly simply was nothing to object to or challenge in the sentencing

2 determination made by the court.[78]

3    Ground 5(h) therefore does not provide a basis for federal habeas relief.[79]

4    **Ground 5(i)**

5    The Court will grant petitioner's motion (#92) to dismiss the unexhausted Ground 5(i).

6    **Ground 6:  Effective Assistance of Appellate Counsel**

7    In Ground 6, petitioner alleges that he was denied a right to effective assistance of

8 appellate counsel in violation of the Sixth and Fourteenth Amendments.  He alleges multiple

9 distinct instances of alleged ineffective assistance, which are discussed in more detail below.

10    When evaluating claims of ineffective assistance of appellate counsel, the performance

11 and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263

12 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

13

14    [78]There similarly was nothing to object to or correct in the State's presentation.  The State was
15 arguing precisely for the sentencing result properly reached by the court.  Neither the State nor the court
  equated the ultimate parole exposure on a 10 to 25 sentence to the parole exposure on a life sentence.  The
16 State instead argued for, and the court sentenced McCaskill to, a life sentence precisely so that he would be
  subject to parole for life rather than for a finite period.

17    Petitioner further suggests, based on state post-conviction evidentiary hearing testimony, that
18 defense counsel did not understand that the full 10-year minimum had to be served, without reduction for
  good time, before McCaskill would be eligible for parole consideration on each sentence.  However, any such
19 alleged misunderstanding had nothing to do with the exhausted claim of error presented in Ground 5(h),
  which pertains to the tail end of the sentence, not the minimum.  Nor could  any such misunderstanding
20 prejudice petitioner in this sentencing following a verdict rather than a plea.  On either sentencing alternative,
  McCaskill was going to serve the same 10-year minimum sentence.  That is, with a choice only between 10 to
21 25 and 10 to life, counsel allegedly misunderstanding how the 10 was served was not going to change the
  fact that McCaskill was going to be sentenced to the 10 year minimum regardless on either option.

22    [79]Moreover, "the Supreme Court has not delineated a standard which should apply to ineffective
23 assistance of counsel claims in noncapital sentencing cases [such that] ... there is no clearly established
  federal law as determined by the Supreme Court in this context." *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th
24 Cir.2006)(quoting prior authority); *Davis v. Belleque*, 2012 WL 76897 (9th Cir., Jan. 11, 2012)(unpublished);
  *Vigil v. McDonald*, 2011 WL 5116915 (9th Cir., Oct. 28, 2011) (unpublished)(harmonizing authority).  Because
25 there was no clearly established United States Supreme Court precedent that applies in this noncapital
  sentencing context, petitioner cannot establish that the state courts' rejection of his claim was either contrary
26 to or an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Id.*
  Even if the Supreme Court were to announce such law subsequently, the state supreme court's decision
27 nonetheless must be viewed in relation to the law at the time of the state supreme court's November 14,
  2008, decision on the merits on state post-conviction review.  *Greene v. Fisher*, 132 S.Ct. 38 (2011). Ground
28 5(h) in any event is factually flawed as discussed in the text.

-43-

1  Effective appellate advocacy requires weeding out weaker issues with less likelihood of
2  success.  The failure to present a weak issue on appeal neither falls below an objective
3  standard of competence nor causes prejudice to the client for the same reason – because the
4  omitted issue has little or no likelihood of success on appeal.  *Id.*

5  　　　　　*Ground 6(a/b):  Transition Instruction*

6  　　　　　In Ground 6(a/b),[80] petitioner alleges that he was denied effective assistance of
7  counsel when appellate counsel failed to challenge the failure of the trial court allegedly to
8  give a proper "unable to agree" transition instruction in lieu of an improper "acquittal first"
9  transition instruction.  As discussed, *supra*, with respect to parallel claims in Grounds 3 and
10 5(a/b),the underlying substantive claim is wholly flawed both factually and legally.  As both the
11 state supreme court and this Court have concluded, the transition instruction given at
12 petitioner's trial *was* an "unable to agree" instruction.  This related claim of ineffective
13 assistance of counsel therefore also is fundamentally flawed both factually and legally.  The
14 state supreme court's rejection of this claim accordingly was neither contrary to nor an
15 unreasonable application of *Strickland* because there was neither deficient performance in
16 nor resulting prejudice from appellate counsel's failure to pursue this fundamentally flawed
17 claim.

18 　　　　　Ground 6(a/b) thus does not provide a basis for federal habeas relief.

19 　　　　　*Ground 6(c/d):  Comment on Invocation of Fifth Amendment Rights*

20 　　　　　In Ground 6(c/d), petitioner alleges that he was denied effective assistance of counsel
21 when direct appeal counsel did not raise an issue regarding the prosecution allegedly
22 commenting on his Fifth Amendment rights, based on the allegations of Ground 4.

23 　　　　　/ / / /

24

25 　　　　　[80]As discussed in note 64, petitioner misconstrued the Court's screening order to mean that a claim
26 of ineffective assistance of counsel in violation of the Sixth Amendment must be alleged as a separate claim
   from the same claim under the Fourteenth Amendment.  The invocation of two constitutional amendments,
27 particularly where one of the Bill of Rights is applied through the Fourteenth Amendment, clearly does not
   present two claims.  The Court follows this unusual labeling of the subparts given that the next single subpart
28 is identified as Ground 6(c) and (d).

1    The Supreme Court of Nevada held, *inter alia*, that "in light of the fact that appellant
2  opened the door, appellant failed to demonstrate that any direct appeal claim had a
3  reasonable probability of success."[81]  For substantially the reasons canvassed by this Court
4  as to the substantive claim in Ground 4, the state supreme court's rejection of this claim for
5  lack of prejudice was neither contrary to nor an unreasonable application of *Strickland* or
6  other clearly established federal law.  This conclusion especially follows with regard to the
7  claim of ineffective assistance of appellate counsel given that petitioner himself unilaterally
8  referred to his request for counsel and election to remain silent.  Moreover, there was no
9  objection interposed in the trial court to the State's references to what petitioner already
10  himself had said on the stand.

11    Ground 6(c/d) therefore does not provide a basis for federal habeas relief.

12    ***Ground 6(e):  Exclusion of Evidence of Violent Nature***

13    In Ground 6(e), petitioner alleges that he was denied effective assistance of counsel
14  when appellate counsel allegedly failed to raise an issue on direct appeal challenging the trial
15  court's exclusion of alleged evidence of the violent nature of the victim, based on the
16  allegations of Ground 5(e).

17    The background to this claim is summarized in the text, *supra*, at 33-36.

18    The Supreme Court of Nevada, in pertinent part, rejected the claim of ineffective
19  assistance of appellate counsel on the following grounds, over and above its holding rejecting
20  the related claim of ineffective assistance of trial counsel:

21         . . . .  Inasmuch as appellant seeks a change in the law, we
       decline to revisit our prior decisions.  And to the extent that
22       appellant claims his appellate counsel was ineffective, we
       conclude that appellant failed to demonstrate that this claim had
23       a reasonable probability of success on appeal.

24  #71, Ex. 144, at 6-7.

25    The state supreme court's determination that it would not change its prior decisions
26  and that there was not a reasonable probability that the claim of state law error would have

27  _____

28    [81]#71, Ex. 144, at 5.

-45-

had a reasonable probability of success on appeal all but eliminates any prospect for success on this habeas claim.

The Supreme Court of Nevada is the final arbiter of Nevada state law.  The state high court's determination that it would not change its prior decisions and that the claim of error did not have a reasonable probability of success on appeal under Nevada state law essentially is the final word on that matter.  While petitioner seeks to rehash and reargue the propriety of the state district court's holding on the Nevada state law evidentiary question, a federal district court clearly does not sit as a super state supreme court with authority to review claimed errors under state law.  *See, e.g., Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007).  Petitioner argued to the Supreme Court of Nevada that appellate counsel failed to pursue a viable claim that the state district court erred in its evidentiary ruling, and the state supreme court held that the claim did not have a reasonable probability of success on appeal.  That is the end of the matter with regard to the underlying Nevada state law evidence question.

Petitioner nonetheless urges that the state supreme court's rejection of his claim is contrary to and an unreasonable application of United States Supreme Court precedent because it transgresses a longstanding rule of law announced in the 116-year-old decision in *Smith v. United States*, 161 U.S. 85 (1896).  Petitioner cites *Smith* for the proposition that "being a quarrelsome and dangerous person is competent evidence, especially if his character in this respect was known to the defendant."[82]  Petitioner misapprehends the "clearly established federal law" pertinent to AEDPA review. Petitioner must demonstrate that the state supreme court's decision was contrary to or an unreasonable application of clearly

---

[82]#54, at 27.  Petitioner quotes from a headnote rather than the opinion and incorrectly cites the case.  The actual quote in the opinion was that "evidence that the deceased had the general reputation of being a quarrelsome and dangerous person, was competent, especially if his character in this respect was known to the defendant."  161 U.S. at 88.  The case did not address the admission of specific acts.  Nor did it address a situation where the reputation testimony actually proffered at trial spoke to the victim's propensity for violence only against women.  The actual holding of the case was that the trial court erred when it gave a jury instruction that required the jury to disregard reputation testimony given by witnesses who themselves did not have sterling reputations.

1   established federal law applying a federal constitutional rule applicable to the case.  *Smith*

2   was referring not to a principle of federal constitutional law applicable to the States but instead

3   to a principle of federal evidentiary law applicable in a federal criminal proceeding.  The

4   Supreme Court of Nevada is not required to follow United States Supreme Court holdings

5   regarding federal evidentiary rules applicable in federal criminal trials.  Even if, *arguendo*, the

6   Supreme Court of Nevada applied Nevada evidentiary law in a Nevada state criminal case

7   differently from the *Smith* decision, the state supreme court's decision would not be contrary

8   to or an unreasonable application of *apposite* clearly established federal law.  McCaskill was

9   tried in Nevada state court under Nevada state law, not in a federal criminal proceeding.  The

10  Supreme Court of Nevada, not the United States Supreme Court, is the final arbiter of

11  Nevada state law.

12        Petitioner further suggests that the state district court's evidentiary ruling constrained

13  his right to confront Michelle Maberry on cross-examination, citing to *Davis v. Alaska*, 415

14  U.S. 308 (1974).  The state supreme court's holding that there was not a reasonable

15  probability of success on this subsidiary federal law argument[83] that the state law evidentiary

16  ruling denied petitioner his right of confrontation was neither contrary to nor an unreasonable

17  application of clearly established federal law.  The holding in *Davis* is far afield from the

18  present case.  In *Davis*, the Supreme Court held that a defendant was denied his right to

19  confrontation when the trial court did not allow him to cross-examine a prosecution witness

20  regarding being on probation for a juvenile offense.  Petitioner apparently seeks to draw from

21  *Davis* a broad proposition that state evidentiary rules must yield to Confrontation Clause

22  rights.  However, as the Supreme Court observed in *Harrington v. Richter*:

23
24            A state court's determination that a claim lacks merit
           precludes federal habeas relief so long as "fairminded jurists
25           could disagree" on the correctness of the state court's decision.
           *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158
26           L.Ed.2d 938 (2004).   And as this Court has explained,
           "[E]valuating whether a rule application was unreasonable

27

_____

28        [83] See #71, Ex. 140, at 21 (state post-conviction appellant's opening brief).

1
2

> requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Ibid*. . . . .

3   131 S.Ct. 770, 786 (2011).  Here, a determination that the state evidentiary rule and the state

4   district court's application of it did not deny petitioner a right to confrontation was not an

5   unreasonable application of clearly established federal law.  The Confrontation Clause does

6   not render all state evidentiary rules excluding evidence sought to be admitted by the defense

7   unconstitutional.  Petitioner cites no apposite Supreme Court case law establishing that the

8   state evidentiary rule or ruling violated the Confrontation Clause.

9        Finally, petitioner points to the alleged "dearth" of meritorious issues raised by

10  appellate counsel.[84]  He contends that the present claim could have been presented in lieu

11  of claims that petitioner now suggests were "worthless."[85]  However, the state supreme court's

12  holding that there was not a reasonable probability of success on *this* claim was neither

13  contrary to nor an unreasonable application of clearly established federal law.

14       Ground 6(e) therefore does not provide a basis for federal habeas review.

15                        ***Evidentiary Hearing Request***

16       Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is

17  restricted to the record presented to the state court that adjudicated the merits of the claims.

18  *See Pinolster,* 131 S.Ct. at 1398-1401.

19       IT THEREFORE IS ORDERED that petitioner's motion (#92) for partial dismissal is

20  GRANTED and that Ground 5(i) is DISMISSED without prejudice as unexhausted.

21       IT FURTHER IS ORDERED that petitioner's motion (#86) for reconsideration is

22  DENIED, for the reasons assigned, *supra*, at 31-32.

23       IT FURTHER IS ORDERED that all remaining claims in the petition are DENIED on

24  the merits and that this action shall be DISMISSED with prejudice.

25  _____

26       [84]#90, at 12.

27       [85]Appellate counsel in truth presented three appeal issues in a 26-page brief, including a challenge to
the sufficiency of the evidence, an issue pursued in the present federal petition.  See #68, Ex. 96; see also

28  *id.*, Ex. 98 (reply brief).

-48-

1       IT FURTHER IS ORDERED that a certificate of appealability is DENIED, as jurists of

2   reason would not find the district court's rejection of the claims presented to be debatable or

3   wrong, for the reasons assigned herein.

4       The Clerk of Court shall enter final judgment accordingly in favor of respondents and

5   against petitioner, dismissing this action with prejudice.

6               DATED:  October 16, 2012

7

8

9       _____

10              ROBERT C. JONES
                Chief United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28