# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

JEREMY DALE MCCASKILL,

    *Petitioner*,

vs.

MICHAEL BUDGE, *et al.*,

    *Respondents*.

3:08-cv-00687-RCJ-WGC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the remaining claims, petitioner's motion (#86) for reconsideration as to a prior ruling regarding Ground 5(e), and petitioner's motion (#92) for partial dismissal as to unexhausted claim Ground 5(i). The motion for dismissal of the unexhausted claim will be granted. The Court takes up the motion for reconsideration within the discussion of Ground 5(e).

### Background

Petitioner Jeremy McCaskill seeks to set aside his 2003 Nevada judgment of conviction, pursuant to a jury verdict, of second-degree murder with the use of a deadly weapon, for stabbing Joseph Galdarisi to death with a knife. Petitioner is serving two consecutive life sentences with the possibility of parole after ten years on each sentence. Petitioner challenged his conviction on direct appeal and state post-conviction review.

Petitioner, *inter alia*, challenges the sufficiency of the evidence supporting his conviction for second-degree murder. He contends that the evidence was consistent with self-defense rather than second-degree murder.

1    The evidence presented at trial included the following.[1]

2    Jeremy McCaskill, Nikki Batemon, Joe Galdarisi, and Michelle Maberry all were, to one

3    extent or another, either friends with one another or at least acquaintances as of March 2001.

4    McCaskill and Batemon further had been in a romantic relationship together before, and they

5    had a son together.  At that time, they were moving in the direction of getting back together,

6    although McCaskill at that time was more or less living with another young woman, Catina

7    Murphy.  Galdarisi and Maberry, in turn, also were in a boyfriend-girlfriend relationship.[2]

8    On March 16, 2001, McCaskill and Galdarisi planned to go to a monster truck pull

9    event that evening.  Part of the plan was for McCaskill to use the outing with Galdarisi as a

10   cover and alibi for McCaskill spending time with Nikki Batemon after the event without Catina

11   Murphy knowing that he was with Batemon.[3]

12   Prior to meeting up with Galdarisi, McCaskill stopped by the apartment of Christene

13   Cox, who was Maberry's sister and who also previously had been in a relationship with

14   McCaskill.  He left his pager with Cox so that Catina Murphy could not reach him while he was

15   out with the others.[4]

16   It is undisputed that on the way back from the monster truck show, while in Galdarisi's

17   car, McCaskill and Galdarisi got into an argument.  The argument culminated in McCaskill

18   exiting the vehicle and Galdarisi leaving McCaskill standing on the side of the road.

19

20   [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of
     evidence or statements of fact in the state court.  The Court summarizes same solely as background to the
21   issues presented in this case, and it does not summarize all such material.  No statement of fact made in
     describing statements, testimony or other evidence in the state court constitutes a finding by this Court.  The
22   significance of additional specific evidence or categories of evidence referred to by petitioner in support of his
     claims is discussed in the discussion of the particular claims.  The present recital of the evidence constitutes
23   only an overview for context.  Any absence of mention of a specific piece of evidence or category of evidence
     in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

24
     [2]#66, Ex. 69, at 38-44, 48, 78, 83, 99 & 120-21 (Maberry); id., at 132-37 (Batemon); id., Ex. 70, at
25   179-80 & 209-10 (same); id., at 222-25, 238-39 & 250 (Murphy); id., Ex. 71, at 482-85 (McCaskill).  The
     Court uses Maberry's name at the time of the offense rather than her married name, Cummings, at trial.
26
     [3]#66, Ex. 69, at 44-45 & 99 (Maberry); id., at 136-38 (Batemon); id., Ex. 70, at 180-81 & 210 (same);
27   id., at 225-26 & 239-40 (Murphy).

28   [4]#66, Ex. 70, at 256-60 & 264.

1       Galdarisi drove on to Maberry's house, where Maberry and Batemon had been visiting

2   with one another prior to meeting up with the two men.  Galdarisi told them about the

3   argument and his leaving McCaskill on the side of the road.  He was upset, agitated and

4   excited.  Galdarisi calmed down, however, after he did a line of methamphetamine.  He told

5   Maberry that he would respect her and her home and that he would not fight there if anything

6   did happen.  Maberry testified that he relaxed "a little bit" and appeared to get less angry.[5]

7       Meanwhile, McCaskill had walked to Catina Murphy's home.  He walked in, grabbed

8   his car keys, walked out, and drove off without saying a word to Murphy.  He appeared angry,

9   irritated and upset.[6]

10      McCaskill then went back over to Christene Cox' apartment to retrieve his pager.  She

11  described him as "a little agitated," "very angry," and "ranting."  He told her he was angry

12  because he and Galdarisi had gotten into an argument and Galdarisi had stopped the car and

13  had him get out.  He still was angry but "had calmed down some" by the time that he left.  She

14  did not expect to see him again that evening at that point.[7]

15      By all accounts given at trial, including his own, McCaskill habitually carried a large

16  pocket knife with a blade that was several inches long.  Batemon, Murphy and Cox all testified

17  that they had seen him open the knife quickly with one hand by pressing a button on the knife

18  and then opening it with a flick of his wrist.[8]

19      By all accounts given at trial, including in McCaskill's testimony, Galdarisi did not have

20  a knife or any other weapon on him.[9]

21      / / / /

22  _____

23      [5]#66, Ex. 69, at 44-47 & 100-01 (Maberry); *id.*, at 139-40 (Batemon); *id.*, Ex. 70, at 181-82 (same).

24      [6]#66, Ex. 70, at 226-28, 240, 242-43 & 250 (Murphy).

25      [7]#66, Ex. 70, at 260-62 (Cox).

26      [8]#66, Ex. 70, at 177-79, 197-201 & 214-15 (Batemon); *id.*, at 232-33 (Murphy); *id.*, at 267-68 & 270
27  (Cox).  Whether McCaskill had only one knife or multiple knives over time as he testified is immaterial.  That
    he had at least one such knife with him when he killed Galdarisi is all that is material in that regard.

28      [9]#66, Ex. 69, at 82-83 (Maberry); *id.*, Ex. 70, at 179 (Batemon); *id.*, at 307 (crime scene detective).

1    Both men were young, well-developed men of similar height.  Galdarisi was "maybe

2    a little bit . . . but not tremendously" bigger.  Both men were strong young men, but Maberry

3    testified that Galdarisi was "a lot stronger."[10]

4    On the evening in question, both men were observed to be "buzzed" drunk rather than

5    "falling down" or "stumbling" drunk, with neither man slurring his speech.[11]

6    About twenty minutes after Galdarisi arrived at Maberry's home, McCaskill bolted

7    through the door, with Nikki Batemon cutting him off.  McCaskill "got in Galdarisi's face" and

8    started yelling at him, saying "do you have a problem," and that they could "deal with it."

9    Maberry testified that "[h]e sounded angry but more sarcastic, like there was something

10   behind it."  She testified that he was angry because Galdarisi had left him on the roadside.[12]

11   Both women testified that McCaskill appeared to be the primary verbal aggressor at

12   that time.  Galdarisi, while upset, instead was trying to diffuse the situation, saying that they

13   did not have "to do this here."  Galdarisi was speaking loudly, but he frequently did so

14   because he was hard of hearing.  Galdarisi did not attempt to push McCaskill nor did he swing

15   at him.  Maberry told them to take it outside because there were children in the house.

16   McCaskill responded in a sarcastic tone that "yes, we can talk about this . . . outside."[13]

17   McCaskill went outside first, followed by Batemon.  She tried to get McCaskill to

18   promise that he would not fight, but he did not do so, just saying "don't worry about it."

19   Galdarisi stayed back a moment with Maberry.  He told her not to worry, that he would not

20   disrespect her home.  When Batemon came back inside, she heard Galdarisi tell Maberry that

21   he would "put it on his skin" that he would not fight, which was street terminology for "a

22

23   [10]#66, Ex. 69, at 101-02, 104, 121-22 & 128 (Maberry); *id.*, Ex. 70, at 186 & 207-08 (Batemon).  The autopsy reflected that Galdarisi was 5'11" and weighed 194 pounds.  #66, Ex. 71, at 375 & 389.

24

25   [11]#66, Ex. 69, at 53-54 (Maberry); *id.*, at 140 (Batemon); *id.*, Ex. 70, at 181-82 & 209 (same); *id.*, at 240-42 & 253-55 (Murphy).

26   [12]#66, Ex. 69, at 48-51, 122-23 & 125 (Maberry); *id.*, at 140-43 (Batemon); *id.*, Ex. 70, at 182-85 (same).

27

28   [13]#66, Ex. 69, at 51-55, 102-04, 122-23 & 128 (Maberry); *id.*, at 143 (Batemon); *id.*, Ex. 70, at 209 & 218-221 (same, including discussion of preliminary hearing testimony).

1   stronger bond than like a promise." #66, Ex. 69, at 55-56 (Maberry); *id.*, at 143-48 (Batemon);
2   *id.*, Ex. 70, at 185-86.

3          A few minutes later, the women heard loud voices outside, and Batemon looked out.
4   When she first looked out, she told the men to keep the noise down because of the
5   neighbors.  Shortly thereafter, she saw them, through the open door, arguing face-to-face,
6   and one pushed the other, starting the physical fight.[14]

7          The two women then went outside.  Less than five minutes had passed at this point
8   since the time that the men had went outside.  The women saw the men in the middle of the
9   driveway circling each other with their arms up similar to a boxing stance.  Maberry testified
10   that McCaskill had a very serious and angry look on his face, and it looked to her like things
11   "were going to get pretty ugly."[15]

12          The women talked separately with the men, with each trying to calm their boyfriend.
13   Galdarisi stayed angry during the time that Maberry tried to calm him down.  At some point,
14   Galdarisi spun Maberry around and pushed her up against a car, causing a bruise.  She
15   testified that, by this point, "he was so mad that there was just no turning back, he was angry,
16   he wasn't going to calm down any more," which scared her.[16]

17          Maberry walked over to McCaskill to try and calm him down.  Maberry testified at trial
18   that she did not know whether McCaskill had calmed down.  Batemon testified that McCaskill
19   "wasn't calming down like I wanted him to." Maberry testified that McCaskill told Batemon to
20   get the baby and find his hat, because he wanted to go.  Batemon did not recall McCaskill
21   saying those things rather than herself, as she was going to go get her daughter from inside
22   with the understanding that she and McCaskill would be leaving.[17]

23          / / / /

24   _____

25          [14]#66, Ex. 69, at 55-56 (Maberry); *id.*, at 147-49 (Batemon); *id.*, Ex. 70, at 186-87 (same).

26          [15]#66, Ex. 69, at 55-57, 104-05 & 107-08 (Maberry).

27          [16]#66, Ex. 69, at 57, 107-110 & 119 (Maberry); *id.*, at 149-50 (Batemon).

28          [17]#66, Ex. 69, at 58, 108-09 & 111-12 (Maberry); *id.*, at 150 (Batemon); *id.*, Ex. 70, at 187-89, 205-07.

1    However, as Maberry was talking to McCaskill, a Pepsi can hit Maberry in the head and

2  ricocheted close to where McCaskill was standing.  Galdarisi had been drinking the Pepsi

3  from when he was back in the house, from about twenty minutes earlier.  Maberry testified

4  that it felt like it had "a lot of fluid" in it.  Neither Bateman nor Maberry observed the can hit

5  McCaskill.  Neither Bateman nor Maberry observed any injuries on McCaskill at this point.[18]

6    Nikki Bateman was looking at McCaskill's face when the Pepsi can was thrown.  She

7  testified as follows as to what she saw reflected in his face:

8
9       Q:    And describe for the jury what you saw in terms of
             the defendant's face when that can was thrown.

10      A:    When you know somebody really well and they are
11            arguing, and then they have their snapping point,
             that is what I saw. It was like they are at the point
12            where you can't help no matter what.

13      Q:    At that point after the can was thrown, did he look
             like he was in a rage?

14      A:    Yeah.

15      Q:    Do you recall using the phrase he snapped before?

16      A:    Yes.

17      Q:    Is that what happened?

18      A:    Yeah. I was looking at him, just the way his eyes
19            looked you can tell he snapped beyond that one
             point of being able to stop anything, and that's
20            when we went into the house.

21      Q:    And then you go back inside once you saw that;
             correct?

22      A:    Yes.

23      Q:    Because you realized what?

24      A:    That there's nothing that I could do to stop it.

25  #66, Ex. 69, at 151-52.

26

27  _____

28  [18]#66, Ex. 69, at 57-59, 105-09, 112, 123-25 & 129  (Maberry); *id.*, at 149-51 (Batemon); *id.*, Ex. 70,
    at 189-91, 205, 218 & 221 (same).

1    Maberry also looked at the two men and said to Batemon "they are not going to stop."
2    According to her testimony, after the Pepsi can was thrown, Galdarisi was the primary
3    aggressor; and he "went after" McCaskill.  However, the women did not ever see Galdarisi
4    strike McCaskill at any time that evening.[19]

5    The women then went back inside.  Maberry heard loud voices, but the women did not
6    hear any signs of a physical fight after they went inside.  Less than two minutes after they had
7    gone inside, they heard the sound of a vehicle pulling out "pretty quickly."  Batemon testified
8    that they had gone inside and had just started getting their coats to leave when they heard
9    the car pulling out quickly.  When Batemon looked out, she saw the taillights of McCaskill's
10   vehicle as he was driving away.  By the time that Maberry looked out, McCaskill's vehicle
11   already was gone.[20]

12   When the women went outside, they did not see Galdarisi at first.  Maberry then saw
13   him lying on his back, with his head partially underneath his car and his arms sprawled out,
14   along with blood underneath him.  Blood appeared to be coming from his upper body, and he
15   was nonresponsive and did not appear to be breathing.  When they pulled one of the cars
16   around to put the headlights on him, they saw that the blood was worse than they thought.
17   There was what both described as "a lot" of blood underneath him and more blood in the
18   parking lot.[21]

19   The women then drove to a drug store a couple of miles away and made an
20   anonymous 911 call.  Maberry testified that they stated that they saw a fight and a body fall
21   while driving down the road.  She testified that she did so because she was high, she had
22   children, and she had an outstanding bench warrant on a traffic ticket.  Batemon testified that
23   they panicked when they saw that Galdarisi was dead.   #66, Ex. 69, at 63 & 112-13
24   (Maberry); id., at 156-57 (Batemon); id., Ex. 70, at 192 & 203 (same).

---

[19]#66, Ex. 69, at 109-10, 126 & 129 (Maberry); id., at 151 (Batemon); id., Ex. 70, at 191 (same).

[20]#66, Ex. 69, at 59-61 & 126 (Maberry); id., at 153-55 (Batemon); id., Ex. 70, at 191-92, 204 & 215.

[21]#66, Ex. 69, at 61-63 (Maberry); id., at 155-56 (Batemon); id., Ex. 70, at 192.

1    Meanwhile, McCaskill drove again to Christene Cox' apartment.  She testified that she

2    was in her bedroom at about 11:40 p.m. when she saw the headlights of a vehicle pulling into

3    the apartment complex parking lot.  She looked out the window and saw McCaskill pulling his

4    vehicle into the driveway.  He usually parked in front of her apartment.  However, this time he

5    drove further down and parked beside garbage cans about two apartments down from hers.[22]

6    When McCaskill came inside, he was "really like pumped up," "really excited," and

7    "agitated."  He told Cox that he needed to call her sister, Michelle Maberry, because he and

8    Galdarisi had got into a fight and he had "stuck him."  Cox understood that to mean that

9    McCaskill had stabbed Galdarisi.  McCaskill did not say that Galdarisi had attacked him with

10   a knife or a gun, that Galdarisi had any weapon, that Galdarisi had attacked him, or that he

11   had acted in self-defense.  He just stated that they were in a fight and he "stuck him."[23]

12   Cox did not see any cuts or bruises on McCaskill's head or on any other part of his

13   body.  He did take a band-aid and place it on his right index finger.  However, Cox had not

14   seen any blood on his hand or finger.  Cox did not notice any signs that McCaskill had been

15   beat up or in a fight, and she saw only that there was a lot of dirt on the lower part of his

16   pants.  She acknowledged on cross-examination that she said in her statement to the police

17   that "his face did look marked, his hands didn't."  She did not recall on redirect what she

18   meant by that, as she did not remember there being any redness on his head or face.  She

19   responded affirmatively on recross to it meaning both "dirt marks" and "injuries."[24]

20   McCaskill was at Cox' apartment for only approximately four to five minutes. McCaskill

21   told Cox that he was sorry for involving her and walked out.[25]

22   / / / /

23   / / / /

24   _____

25   [22]#66, Ex. 70, at 262-63 (Cox).

26   [23]#66, Ex. 70, at 263-65, 270 & 277-80 (Cox).

27   [24]#66, Ex. 70, at 265-66 & 270-277 (Cox).

28   [25]#66, Ex. 70, at 266(Cox).

-8-

1    Thereafter, McCaskill contacted Michelle Maberry by phone and met up with Maberry
2    and Nikki Batemon near where Batemon had been staying with her grandmother.[26]

3    McCaskill admitted to having "stuck" Galdarisi.  When Maberry asked McCaskill why
4    he had stabbed Galdarisi, he said that "it happened so fast" and "I don't know what
5    happened."  When Batemon asked where the knife was, McCaskill said that "it's taken care
6    of" and not to worry about it.  McCaskill did not make any claim that Galdarisi had a knife or
7    any other weapon.  Maberry testified that McCaskill boasted to the women that Galdarisi "did
8    not get the best of him" and that McCaskill "did not have any marks" on himself.  Batemon
9    similarly testified that McCaskill bragged that "he beat the hell out of Joe."  This boasting
10   made Maberry sick to her stomach.[27]

11   McCaskill asked the women to lie, to say that he was not there during the fight, and to
12   make up a description of a fictitious person instead.[28]

13   Maberry acknowledged on cross-examination that when she told McCaskill that she
14   thought that Galdarisi was dead, his demeanor changed.  She also acknowledged that
15   McCaskill said at one point "he kept pumping me, he kept pumping me, the next thing I know
16   I stabbed him."  Batemon similarly testified that she did not think that McCaskill realized that
17   he had killed Galdarisi before they told him that they thought he had.[29]

18   McCaskill still was wearing the same clothes that he had on at the time of the fight.
19   The three went to Batemon's grandmother's home, and McCaskill changed into different
20   clothes.  Batemon testified that McCaskill asked her for clothes to change into.  Batemon
21   noticed blood on McCaskill's pants, however later forensic testing reflected that it was his own
22   blood.  The pants were put in a garbage can outside.  Batemon testified that it was

24   [26]#66, Ex. 69, at 63-65 & 113-16 (Maberry); *id.*, at 157 (Batemon); *id.*, Ex. 70, at 192 (same).

25   [27]#66, Ex. 69, at 65-72, 116 & 126-27 (Maberry); *id.*, at 158-62 (Batemon); *id.*, Ex. 70, at 193 & 201
26   (same).

27   [28]#66, Ex. 69, at 68 (Maberry); *id.*, at 160-61 (Batemon).

28   [29]#66, Ex. 69, at 118-19 (Maberry); *id.*, at 157-58 (Batemon); *id.*, Ex. 70, at 193 (same).

1   McCaskill's idea to put the pants in the garbage can.  #66, Ex. 69, at 72-77 (Maberry); id., at

2   162-65 (Batemon); id., Ex. 70, at 173-76, 194-97 & 210-12 (same); id., at 348-49 (forensics).

3        Maberry testified that she did not see any injuries, although there was a red mark or

4   spot on McCaskill's forehead, with no lesion or bleeding.  She acknowledged that she had

5   testified at the preliminary hearing that "[h]is forehead seemed a little red, and I thought

6   maybe there was a cut there."  Batemon testified that McCaskill had a red bump on his

7   forehead but that it was not an open wound with bleeding.  She further saw a band-aid on his

8   thumb.  When she asked McCaskill how he hurt his thumb, he just said that he had cut

9   himself.  She did not see any other injuries on him.[30]

10       While they were at the grandmother's home, Maberry and Batemon heard McCaskill's

11  end of a telephone call that he made to Catina Murphy.  McCaskill previously had told

12  Maberry that he had told Murphy to say that he had been in California visiting his son.  In the

13  subsequent telephone call, McCaskill told Murphy that if the police showed up to tell them

14  instead that he had arrived home at about 10:00 p.m. after the monster truck event and that

15  McCaskill and Murphy then had spent the time thereafter together.[31]

16       After the call, McCaskill again asked Maberry to lie for him to cover up his killing of

17  Galdarisi.  He asked her to "please have my back on this," and that if she did so, he would

18  "have her back" on anything.  He referred to needing to be there for his son, and he stated

19  that "there's no reason for both of their lives . . . to be over with," referring to himself and

20  Galdarisi.[32]

21       McCaskill returned to Catina Murphy's home about 2:00 a.m.  He was upset, and he

22  was wearing different clothes.  Murphy did not see any cuts or bruises on McCaskill's face or

23  body.  She later stated to the police that he appeared to be "in shock," but she said this during

24  an interview in which she lied for McCaskill.  #66, Ex. 70, at 228-31, 244, 251-52 & 255-56.

25  _____

26      [30]#66, Ex. 69, at 116-17 (Maberry); id., Ex. 70, at 176-77, 196 & 202 (Batemon).

27      [31]#66, Ex. 69, at 78-80 (Maberry); id., at 166-67 (Batemon); id., Ex. 70, at 172-73 (same).

28      [32]#66, Ex. 69, at 80-81 (Maberry).

1       Murphy testified that at this juncture McCaskill asked her to lie to the police and tell

2   them that he had been with her continuously after 10:30 p.m.[33]

3       Murphy saw that McCaskill had his knife when he left for the monster truck show, but

4   he did not have it with him when he returned in the early morning hours.  He told her that he

5   threw it away in some bushes so that no one would be able to find it.[34]

6       The police arrived at Murphy's home the next morning at 8:45 a.m.  The phone rang,

7   but McCaskill and Murphy did not answer it.  Murphy heard a knock on the door, looked out

8   the window, and saw the police.  She came downstairs, answered the door, and stepped

9   outside.  McCaskill, however, did not come down until "around five minutes" later.[35]

10       When Murphy was interviewed by the police, she lied as McCaskill had asked her to

11   do and told the police that he was with her continuously after 10:30 p.m. the night before.[36]

12       At trial, McCaskill's testimony specifically in support of his self-defense defense, in

13   pertinent part, consisted of the following, for the less than two minutes after the women went

14   back in the house:

15           Q:    And you don't recall who swung the first swing at
                 that time?

16

17           A:    Oh, he did. He came at me to fight. That's why I
                 backed up into position and we started to fight
                 again.  And at some point, I am losing balance.  I

18                    am on the ground and he does not allow me to get
                 back up off the ground. He goes to kick me while

19                    I am on the ground.  And I move where it would
                 have been my jaw at the time and it ends up being

20                    part of my shoulder. And I ended up spinning
                 around on the ground. And from the point that I

21                    came back up, I did not believe this man was going
                 to stop. I believed that he was going to -- once I'm

22                    past the point of unconsciousness, he is not going
                 to stop. He is in a rage.  At that time I was scared.

23                    And I came up off the ground and I had a knife right

24   _____

25   [33]#66, Ex. 70, at 230 (Murphy).

26   [34]#66, Ex. 70, at 233-34 & 247-48.

27   [35]#66, Ex. 70, at 234-36 & 248-50.

28   [36]#66, Ex. 70, at 230-31.

1

2

3       here on my pocket. And I brought that knife out and
        he did not give me any time to aim, to get fully up
        off the ground, to stand fully erect. So I started
        swinging.  I remember swinging one, two, three,
        four and he is still on me. He still took a couple
        other swings.

4

                                . . . . .

5

6       Q:     Did you have any reason to believe he was not
               going to stop?

7       A:     Yes, I felt he was in a rage at that point.  He was
               blacked out and there was just no stopping the guy.

8

        Q:     Did you see his face?

9

        A:     Yeah, I can see his face.

10

        Q:     What did you observe in his face?

11

        A:     I could see anger.  I could see nothing but anger.

12

13  #66, Ex. 71, at 469-70.

14      McCaskill referred back to a prior incident when he was "jumped" by – three – men.

15  He maintained that, in that prior incident, he sustained "three ribs or two ribs broken," a big

16  cut on his lip, and "plenty of bruises and stuff."  He maintained that "if it wasn't for somebody

17  coming out there and also getting some damage, they would have killed me."[37]

18      McCaskill maintained that he did not know that Galdarisi was dead or dying when he

19  left.  He maintained that after stabbing a man who then fell to the ground at the very least

20  unconscious, he left because he had a bench warrant for a traffic offense.[38]

21      McCaskill differed with the testimony of the women as to the particulars of the leadup

22  to the fight after he arrived at Maberry's home, whether he was hit with the Pepsi can, whether

23  it was his idea to change his clothes, specifically where (but not that) he asked Maberry and

24  Batemon to lie to the police, and other details.  He maintained that Maberry and Batemon

25  "had their . . . reasons" to lie at trial and were "trying to cover their own butt" in some

26  _____

27      [37]#66, Ex. 71, at 456 & 470-71.

28      [38]#66, Ex. 71, at 462, 473-74 & 487-88.

                                -12-

1    unspecified sense.  He conceded that Murphy and Cox had no reason to lie.  Moreover, he
2    did not dispute that Galdarisi had no knife or other weapon, that Galdarisi told Maberry inside
3    the house that they were going outside just to talk, that McCaskill swung his knife at least
4    twice, that he knew that he had stabbed Galdarisi when he left, that the first thing that he did
5    after he sped away was get rid of the knife that he used to stab Galdarisi, that he did in fact
6    change out of the clothes that he wore when he stabbed Galdarisi, that he asked the women
7    to lie to the police, and that he initially lied to the police, purportedly to "stall" the police.[39]

8         The police found Galdarisi's body laying face up with his head slightly under the rear
9    bumper of his car and his arms outstretched over his head with the backs of both hands to
10   the ground.  The position of his body was consistent with Galdarisi having fallen backwards
11   with his arms stretched over his head, possibly hitting his head or a hand on the car bumper
12   on the way down.  The position of the body observed by the police also was consistent with
13   the accounts of Maberry, Batemon, and a passerby who saw the body and also called the
14   police.  The passerby testified that the body was in the same position as when he first saw
15   it when the police secured the scene.[40]

16        Amongst other blood stains found at the scene, blood on the rear bumper was
17   consistent with Galdarisi falling backward and possibly striking the bumper with his head or
18   a hand on his way to the ground.  A large amount of blood was present on the body and at
19   the scene, with the front of Galdarisi's t-shirt being completely saturated with blood.[41]

20        Galdarisi was killed by a stab wound that "went straight in" and penetrated his heart.
21   He sustained one other cutting injury to his left flank from a superficial slashing wound that
22   would not have been fatal.  Galdarisi died specifically from cardiac tamponade, when blood
23   filled the space immediately around his heart and caused it to stop pumping.  #66, Ex. 70, at
24   359-65 (forensic pathologist); *id.*, Ex. 71, at 385, 397-98 & 419-20 (same).

25   _____

26        [39]#66, Ex. 71, at 464-69, 474-81, 484, 486, 488-95 & 498-509.  See also *id.*, at 509-19 (lies to police).

27        [40]#66, Ex. 70, at 281-86 (passerby); *id.*, at 290-91 & 295 (detective).

28        [41]#66, Ex. 70, at 292, 299-300, 303-04, 315-17, 334-35 (detective).

1    There additionally were one or two areas of scrapes and bruising on Galdarisi's

2  abdomen that possibly could have been made from the tip of a knife scraping across his body

3  but being impeded by clothing.[42]

4    There were no abrasions or cuts to the knuckles of Galdarisi's right hand, and there

5  were only minor possible abrasions or scrapes on the knuckles of his left hand.   Such

6  abrasions possibly could have been caused by striking or punching someone, but they also

7  could have been caused by Galdarisi striking the car with the back of his hand as he fell.[43]

8    The forensic pathologist who performed the autopsy also observed redness on the

9  back of Galdarisi's hands.  He attributed this to a post-mortem artifact, specifically from blood

10  settling due to gravity as Galdarisi's body lay on the ground with his arms outstretched over

11  his head and the backs of his hands to the ground.  Consistent with this finding, he noted

12  areas of blanching on the knuckles or other areas on the back of the hand where the pressure

13  of an area being in contact with the ground instead would displace the otherwise settling

14  blood.[44]

15    Indeed, the forensic pathologist testified that the redness on the left knuckles that he

16  also identified as possibly scrapes or abrasions instead may have represented only an

17  accentuation of the lividity or settling of the blood post-mortem.[45]

18    It was the opinion of the forensic pathologist that the minor findings that he observed

19  to the left hand were not indicative of a prolonged or violent fistfight.  He testified that it was

20  unlikely that the minor findings noted on the left hand were consistent with someone using the

21  hand to punch someone with a great amount of force.[46]

22    / / / /

23  _____

24    [42]#66, Ex. 71, at 379, 384 & 400-01.

25    [43]#66, Ex. 70, at 365-67; *id.*, Ex. 71, at 406-07, 413-17 & 422.

26    [44]#66, Ex. 70, at 367-69; *id.*, Ex. 71, at 385-88.

27    [45]#66, Ex. 71, at 385-89.

28    [46]#66, Ex. 70, at 367.

1        The forensic pathologist acknowledged that punching someone in the stomach, biceps,

2   or other soft tissue "possibly" would not bruise the knuckles or leave any redness.  He further

3   acknowledged that certain bruises depicted in pictures -- which had been  taken of McCaskill

4   approximately fourteen hours after the killing -- also "possibly" could have resulted from

5   punches that might not bruise a puncher's knuckles.  He further testified on redirect, however,

6   that the bruises shown in the pictures also could have been caused by the individual

7   squeezing their own arms very tightly.  Moreover, the pictures were of fresh bruises that could

8   have been produced less than eight hours before the pictures were taken, and there would

9   have been prior manifestation of the bruising on the skin.  Bruises would not simply have

10  appeared from previously normal-appearing skin nine or ten hours after the offense with no

11  prior indication.  Furthermore, even if the bruising of the biceps resulted from being punched,

12  such punches to the biceps would not have been life-threatening.[47]

13       The forensic pathologist reiterated on redirect his opinion that the minor findings

14  observed on Galdarisi's left hand were not indicative of a prolonged or violent fist fight.[48]

15                         ***Standard of Review on the Merits***

16       The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

17  deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which

18  demands that state-court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*,

19  131 S.Ct. 1388, 1398 (2011).  Under this highly deferential standard of review, a federal court

20  may not grant habeas relief merely because it might conclude that a decision was incorrect.

21  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the

22  decision: (1) was either contrary to or involved an unreasonable application of clearly

23  established law as determined by the United States Supreme Court based on the record

24  presented to the state courts; or (2) was based on an unreasonable determination of the facts

25  in light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

26  _____

27     [47]#66, Ex. 71, at 401-06, 412-14 & 423-27.  See also *id.*, at 440-45 (re: taking of the pictures).

28     [48]#66, Ex. 71, at 414.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.*, *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

-16-

1      Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct

2   unless rebutted by clear and convincing evidence.

3      The petitioner bears the burden of proving by a preponderance of the evidence that

4   he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

5                                          ***Discussion***

6   ***Ground 1:  Sufficiency of the Evidence***

7      In Ground 1, petitioner alleges that there was insufficient evidence to sustain his

8   conviction, contending that the evidence was consistent with self-defense rather than second-

9   degree murder.

10     On direct appeal, the Supreme Court of Nevada rejected the claim presented to that

11  court on the following grounds:

12
13              .  .  . McCaskill contends that insufficient evidence
        supported his conviction for second-degree murder with the use
14      of a deadly weapon.  Instead, McCaskill contends that the jury
        should have found that he lawfully acted in self-defense when he
        stabbed and killed Galdarisi.
15
16              This court reviews a challenge to evidence supporting a
        conviction for "'whether, after viewing the evidence in the light
17      most favorable to the prosecution, any rational trier of fact could
        have found the essential elements of the crime beyond a
18      reasonable doubt.'" Issues concerning the weight and credibility
        of conflicting witness testimony, including the testimony of the
19      defendant himself, are within the sound province of the jury and
        will not be disturbed on appeal so long as the verdict was
20      supported by substantial evidence.

21              Murder is defined as "the unlawful killing of a human being,
        with malice aforethought."  Those acts of murder which do not
22      constitute murder in the first degree are murder in the second
        degree.   The malice necessary to support a second-degree
23      murder conviction is implied "'when no considerable provocation
        appears, or when all the circumstances of the killing show an
24      abandoned and malignant heart."  Malice aforethought may be
        inferred when the defendant intentionally uses a deadly weapon
        to commit the killing.
25
26              Here, undisputed evidence was presented to the jury that
        McCaskill stabbed Galdarisi twice with a knife during an
27      altercation that began as an argument and turned into a fistfight
        between the two men.  One of these two stab wounds pierced
28      Galdarisi's heart, causing his death.

-17-

McCaskill testified in his own defense at trial and admitted that he stabbed Galdarisi. McCaskill, however, claimed that he stabbed Galdarisi in self-defense. NRS 200.200 provides that a lawful killing in self-defense occurs when

> 1.  [t]he danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and

> 2. [t]he person killed was the assailant, or ... the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

The defendant's fear of death or bodily harm must be reasonable.

Although there was testimony that Galdarisi was in a rage and aggressive once the fight began, there was also testimony that McCaskill was equally in a rage and aggressive during the fight and that he was the initial aggressor provoking the altercation. The evidence before the jury suggested that both men voluntarily engaged in the fight. McCaskill, however, was the only man who entered the fight with a weapon – a knife.

McCaskill claimed that he stabbed Galdarisi out of fear; however, other witness testimony was that McCaskill "snapped" when an empty soda can was thrown minutes before Galdarisi was fatally stabbed.  There was no evidence that McCaskill ever attempted to physically retreat from the fight, despite multiple opportunities to do so. There was no evidence that Galdarisi ever possessed or threatened McCaskill with any weapons. McCaskill even admitted that Galdarisi did not threaten him with any weapons that night. Nor was there any evidence that McCaskill was seriously injured by Galdarisi. Rather, McCaskill suffered what appeared to be only minor bruises and a cut on his thumb during the fight, which may have well been the result of McCaskill's use of his own knife.

Additionally, McCaskill's actions after stabbing Galdarisi, although not dispositive proof of guilt in themselves, were inconsistent with someone who had acted in self-defense.  After stabbing him, McCaskill left Galdarisi lying on the ground by a car and bleeding and made no attempt to contact the police or seek medical help. McCaskill disposed of the knife and later changed his bloody clothes, attempting to dispose of them as well. Witnesses testified that McCaskill bragged about both the fight and stabbing Galdarisi. McCaskill also attempted to convince three people to lie to the police on his behalf, and initially lied to the police himself about the incident.

Given McCaskill's initial aggression toward Galdarisi, the absence of serious physical injury to McCaskill or evidence that Galdarisi was armed, and McCaskill's behavior after the stabbing, a reasonable jury could have found McCaskill's claim that he

1
2
3
4

> acted in self-defense to be unreasonable and unjustified under the law. Based on the evidence above, a reasonable jury also could have found beyond a reasonable doubt that McCaskill acted with the implied malice necessary to support his conviction for second-degree murder with the use of a deadly weapon. We conclude that sufficient evidence supported McCaskill's conviction.

5    #68, Ex. 100, at 1-4 (citation footnotes omitted)(emphasis in original).

6        The state supreme court's rejection of this claim was neither contrary to nor an
7
8    unreasonable application of clearly established federal law as determined by the United
     States Supreme Court.

9        On a challenge to the sufficiency of the evidence, the habeas petitioner faces a
10   "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the
11   standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict must stand
12   if, after viewing the evidence in the light most favorable to the prosecution, any rational trier
13   of fact could have found the essential elements of the offense beyond a reasonable doubt.
14   *E.g., Davis*, 333 F.3d at 992.  Accordingly, the reviewing court, when faced with a record of
15   historical facts that supports conflicting inferences, must presume that the trier of fact
16   resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the
17   resolution by the state court trier of fact of specific conflicts does not affirmatively appear in
18   the record.  *Id.*  The *Jackson* standard is applied with reference to the substantive elements
19   of the criminal offense as defined by state law.  *E.g., Davis*, 333 F.3d at 992.  When the
20   deferential standards of the AEDPA and *Jackson* are applied together, the question for
21   decision on federal habeas review thus becomes one of whether the state supreme court's
22   decision unreasonably applied the *Jackson* standard to the evidence at trial.  *See,e.g., Juan*
23   *H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  Thus, when a federal court assesses a
24   sufficiency of the evidence challenge to a state conviction under AEDPA, "there is a double
25   dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th
26   Cir. 2011).

27       At the very outset on this claim, petitioner bases his challenge to the sufficiency of the
28   evidence on numerous materials that were not in evidence at trial, including preliminary

-19-

1    hearing testimony; police reports, statements, and interview transcripts; bald factual

2    assertions made on federal habeas review without supporting record citation; and even

3    potential evidence *excluded* at trial.  None of this material has any relevance to a challenge

4    to the sufficiency of the evidence presented at trial.  The case long ago was tried and argued

5    to the jury based on the evidence actually presented to the jury.   It is axiomatic that

6    *Jackson* review is based on the same record presented to the jury, not preliminary hearing

7    testimony, police investigative materials, excluded evidence, and most certainly not bald

8    factual assertions made a decade later on federal habeas review.  *E.g., Jackson*, 443 U.S.

9    at 324 ("if it is found that *upon the record evidence adduced at the trial* no rational trier of fact

10   could have found proof of guilt beyond a reasonable doubt")(emphasis added); *Boyde v.*

11   *Brown*, 404 F.3d 1159, 1168 n.8 (9th Cir. 2005).  Particularly given the doubly deferential

12   review under *Jackson* and AEDPA, evidence neither is marshaled anew on federal habeas

13   review nor considered *de novo* without regard to the evidence in fact presented to the jury.

14        Petitioner urges that the Supreme Court of Nevada made an unreasonable

15   determinations of fact when it referred to McCaskill's "initial aggression toward Galdarisi" and

16   stated that there was "no evidence that McCaskill ever attempted to physically retreat from

17   the fight, despite multiple opportunities to do so."

18        In this regard, petitioner urges that "[t]he trial testimony . . . did not remotely

19   unequivocally establish that Mr. McCaskill was the initial aggressor."[49]  What the Supreme

20   Court of Nevada stated in full was as follows:

21             Although there was testimony that Galdarisi was in a rage
          and aggressive once the fight began, there was also testimony
22        that McCaskill was equally in a rage and aggressive during the
          fight and that he was the initial aggressor provoking the
23        altercation.

24   #68, Ex. 100, at 3.  This description of the evidence is amply supported by the testimony of

25   Michelle Maberry and Nikki Batemon, who testified that McCaskill provoked the fight and that

26   both men were in a rage and aggressive after the fight began.  See text, *supra*, at 4-7.

27   ───────────────

28        [49]#54, at 9.

                                         -20-

1    Also in this regard, petitioner urges that he tried to leave but Galdarisi threw the Pepsi

2   can at him and then lunged at him.[50]   However, what the Supreme Court of Nevada stated

3   was that "[t]here was no evidence that McCaskill ever attempted to physically retreat from the

4   fight, despite multiple opportunities to do so."  McCaskill did not physically retreat at any time.

5   Even if McCaskill, *arguendo*, stated to Batemon to get the baby and his hat because he

6   wanted to go, and the evidence was conflicting on that point, he never in fact followed through

7   on any such statement and actually physically retreated.  Having a Pepsi can thrown at him

8   did not prevent McCaskill from physically leaving, and trial evidence strongly supported a

9   permissible inference that the throwing of the Pepsi can made McCaskill angry enough to not

10   want to leave anymore, even if he *arguendo* had said that he wanted to do so in the first

11   instance.  Moreover, the jury was not required to accept McCaskill's own self-serving account

12   of the events.  While Maberry testified that Galdarisi "went after" McCaskill after throwing the

13   soft drink can, the women did not see Galdarisi ever strike McCaskill at any time, including

14   during the time that they walked back into the house after the can was thrown.  The trial

15   evidence amply supported the state supreme court's factual determination that there was no

16   evidence that McCaskill ever attempted to physically retreat, including his not walking away

17   when the women were walking back inside.  The trial evidence, again, instead supported a

18   permissible inference that McCaskill did not attempt to walk away at that point because he

19   was too angry to do so after Galdarisi threw the Pepsi can.[51]

20    The state supreme court's decision accordingly was not based upon an unreasonable

21   determination of fact.

22    The state supreme court otherwise did not unreasonably apply the *Jackson* standard.

23   Petitioner contends that the trial testimony "hues more closely" to self-defense than second-

24   degree murder and that his testimony that he feared for his life was unrebutted.  However,

25   again, *Jackson* review is not a *de novo* review where competing inferences are reweighed by

26

27    [50]#54, at 9.

28    [51]See text, *supra*, at 6-7.

-21-

1    the federal habeas court.   Nor was the jury required to accept McCaskill's self-serving

2    testimony as true, whether directly "rebutted" or not.  There was evidence before the jury, *inter*

3    *alia*, that McCaskill himself had "snapped" after Galdarisi threw the Pepsi can, that he drew

4    his knife and stabbed the indisputably unarmed Galdarisi less than two minutes after the

5    women went inside, that he did so without having sustained any physical injury of note and

6    without any forensic evidence reflecting that Galdarisi was "pummeling him,"[52]  that he fled

7    the scene immediately after purportedly having acted in self-defense purportedly due to a

8    concern over a bench warrant over a traffic ticket, and that he thereafter sought to cover up

9    his purportedly justifiable homicide.  Even McCaskill's own self-defense testimony was on its

10   face extremely tenuous, as McCaskill essentially relied on his entirely self-serving assertion

11   that he feared for his life with very little described action in the way of a purported "fight to the

12   death" prior to his stabbing Galdarisi while allegedly rising onto his feet.  Nor did allegedly

13   being attacked, and injured, by three men at a prior time provide justification for killing anyone

14   that McCaskill ever got into a fight with thereafter.  There was ample evidence from which a

15   jury could find beyond a reasonable doubt that McCaskill stabbed the unarmed Galdarisi in

16   anger, not in self-defense.  The state supreme court's rejection of this claim clearly was not

17   an unreasonable application of *Jackson*.

18        Ground 1 therefore does not provide a basis for federal habeas relief.[53]

19

20        [52]#54, at 9.  The forensic evidence similarly belies rather than supports petitioner's assertion in the

21   federal reply that McCaskill did not use the knife "until he was being severely beaten" by Galdarisi.  #90, at 4.
     There simply was no forensic evidence on either Galdarisi's body – such as significant forensic findings on
     his knuckles – or McCaskill's body – such as significant injury – of such a severe beating occurring before

22   McCaskill pulled his knife within less than two minutes and stabbed the unarmed Galdarisi through the heart.

23        [53]There in truth is no need to expressly address each and every one of the subsidiary factual points

24   argued by petitioner, which essentially beg the question.

25        For example, whether the Pepsi can was or was not nearly full and/or whether the can did or did not
     hit McCaskill is immaterial.  While the throwing of the can may have enraged McCaskill, the soft drink can

26   never put McCaskill in peril for his life.  The soft drink can, which then was lying on the ground, certainly did
     not put McCaskill in peril for his life when McCaskill pulled his knife and stabbed Galdarisi through the heart.

27   Galdarisi, in hindsight, perhaps made the mistake of bringing a Pepsi can to what he did not know was a knife

28   fight, but his throwing a Pepsi can at McCaskill hardly provided McCaskill with justification for stabbing him

                                                                                        (continued...)

-22-

1    ***Ground 3:  Lesser Offense Transition Jury Instruction***

2         In Ground 3,[54] petitioner alleges that he was denied his right to due process when the

3    trial court gave an allegedly improper jury instruction on the transition to lesser included

4    offenses.  Petitioner contends that the jury instruction was an impermissible "acquittal first"

5    instruction, *i.e.*, one that required the jury to unanimously agree to acquit on the greater

6    charge before the jury could consider a lesser included offense.  Petitioner acknowledges that

7    alleged jury instruction errors usually constitute only a matter of state law error not cognizable

8    on federal habeas review.  He contends, however, that the alleged error so infected the entire

9    trial with error as to deprive him of due process.

10        Jury Instruction No. 15 provided for the transition of the jury's consideration from first-

11   degree murder to second-degree and thereafter to voluntary manslaughter and involuntary

12   manslaughter.  The pertinent language used for each of the three transitions was the same,

13   as exemplified by the language for the transition from first to second-degree murder:

14

15   _____

16        [53](...continued)
     through the heart two minutes later.  McCaskill's guilt or innocence did not turn on how many ounces of soft

17   drink were left in the can or whether the can hit him or instead only Maberry.  See also #66, Ex. 70, at 296-97;
     *id.*, Ex. 71, at 435 (Pepsi can evidence contrary to petitioner's subsidiary factual position).

18        Similarly, focusing on McCaskill allegedly being sarcastic rather than angry inside the house does not

19   help McCaskill's case.  Maberry's testimony that McCaskill was sarcastic when stating that the men could
     "deal with it," "like there was something behind it," tends to support a permissible inference of calculated

20   aggression by McCaskill.  Whether McCaskill was angry, sarcastic, or, as the trial testimony actually reflects,
     both, the trial evidence clearly supported a permissible inference that he was the primary verbal aggressor

21   inside Maberry's house.  A collateral dispute over whether he was sarcastic or angry or both is immaterial.

22        Moreover, while petitioner posits that he weighed 165 pounds at the time, this assertion was
     supported only by his trial testimony, which the jury was not required to accept at face value, as McCaskill

23   had every reason to exaggerate the size difference.  His assertion that Galdarisi was taller also is belied by
     rather than supported by the trial record.  See text, *supra*, at 4.  In all events, even if Galdarisi outweighed

24   McCaskill by twenty to thirty pounds, the jury permissibly could infer from the evidence at trial that McCaskill
     stabbed Galdarisi in anger rather than in self-defense.  Merely because one man in a fist fight is larger than

25   the other does not provide the other man justification for stabbing the other man in the fight.

26        In the final analysis, the resolution of all such competing factual arguments and inferences from
     conflicting evidence, including those considered but not specifically expressly discussed herein, remain the

27   province of the jury under the *Jackson* standard.

28        [54]*Inter alia*, Grounds 2 and 7 through 11 have been dismissed as unexhausted.

                                              -23-

> You should first examine the evidence as it applies to Murder in the First degree.  If you unanimously agree that the defendant is *guilty* of Murder in the First Degree, you should sign the appropriate Verdict form and request the bailiff to return you to court.
>
> *If you can not agree* that the defendant is *guilty* of Murder in the First Degree, you should then examine the evidence as it applies to Murder in the Second Degree.  If you unanimously agree that the defendant is *guilty* of Murder in the Second Degree, . . . .
>
> . . . . .
>
> The defendant, of course, can be found Not Guilty of all the offenses enumerated.

#66, Ex. 74, Instruction No. 15 (emphasis added).

On the state post-conviction appeal, the Supreme Court of Nevada rejected a related claim of ineffective assistance of counsel on the following grounds:

> First, appellant claims that trial counsel was ineffective for failing to object to jury instructions guiding the transition from consideration of the primary offense to lesser-included offenses. Specifically, appellant claims that the district court erred in giving an "acquittal first" instruction rather than an "unable to agree" instruction.  Appellant also claims that appellate counsel was ineffective for failing to challenge the instruction on appeal. Appellant failed to demonstrate that trial counsel's performance was deficient.  In *Green v. State*, we adopted the "unable to agree" approach to transition instructions and precluded the use of the "acquittal first" instruction.  *Our review of the record reveals that the jury was given an appropriate "unable to agree" instruction*.  Likewise, because appellant thus failed to demonstrate that this claim had a reasonable probability of success on appeal, appellant failed to demonstrate that appellate counsel's performance was deficient.  Therefore, the district court did not err in denying this claim.

#71, Ex. 144, at 3-4 (emphasis added)(footnotes omitted).

Ground 3 does not provide a basis for federal habeas relief, whether under deferential AEDPA review or *de novo* review.[55]

---

[55]Respondents have not challenged the exhaustion of the underlying substantive claim, suggesting that the claim possibly was raised on the state post-conviction appeal but not explicitly addressed by the state supreme court.  In all events, the Court reaches the same conclusion on either deferential or *de novo* review, without regard to whether or not the underlying substantive claim was implicitly rejected on the merits.

-24-

1    Whether this claim is reviewed *de novo* or on deferential review, the Supreme Court

2  of Nevada remains the final arbiter of Nevada state law.  The state supreme court's holding

3  that there was no state law error wholly undercuts the necessary prerequisite for petitioner's

4  federal due process claim.  That is, there is no predicate state law error for a federal due

5  process claim, even assuming, *arguendo*, that a state law instructional error in this particular

6  regard would have given rise to a due process violation.

7    In *Green v. State*, 119 Nev. 542, 80 P.3d 93 (2003), the Supreme Court of Nevada

8  rejected the use of an "acquittal first" transition instruction and approved the use of an "unable

9  to agree" transition instruction.

10    The disapproved "acquittal first" instructions given by the district court in *Green* read

11  in pertinent part as follows:

12        In order to find the defendant guilty of the lesser [offense]
         . . . , you must *unanimously agree* that the accused did *not*
13        [commit the greater offense].

14                        . . . .

15        After you have unanimously agreed that the defendant is
         *not* guilty of [the greater offense], you then must determine
16        whether or not the defendant is guilty of the lesser included
         [offense].  If you unanimously agree that the defendant is guilty
17        of [the lesser offense], you will sign and date the verdict form
         provided and present it, *and your not guilty verdict* for the [greater
18        offense] to the court.

19                        . . . . .

20        You will note from this instruction that you must
         unanimously agree that the defendant is *not* guilty of the charged
21        crime before you may find the defendant guilty or not guilty of any
         lesser charge.

22  119 Nev. at 546-47, 80 P.3d at 96 (emphasis added).

23    *Green* instead approved "unable to agree" instructions such as had been approved

24  previously by state courts in Arizona, Hawaii and Oregon.  119 Nev. at 547, 80 P.3d at 96.

25  An example of such a charge in a Hawaii case cited in *Green* provided in pertinent part:

26        If you cannot unanimously agree on a verdict on the
         charge of [the greater offense] then you may consider whether
27        [the defendant] committed the [lesser] offense . . . .

28  *State v. Ferreira*, 8 Haw.App. 1, 3, 791 P.2d 407, 408 (1990).

-25-

1    Accordingly, over and above the fact that the Supreme Court of Nevada is the final

2    arbiter of Nevada state law, it is clear that the instruction given in McCaskill's case was the

3    *approved* "unable to agree" instruction and not the *dis*approved "acquittal first" instruction.

4    The charge in this case instructed the jury to enter a verdict on the greater offense only if they

5    could unanimously agree that petitioner was *guilty* of the greater offense.   It did not instruct

6    the jury impermissibly under Nevada law that it could consider the lesser offense only if jurors

7    unanimously agreed that petitioner was *not* guilty.   Rather, if the jurors were unable to agree

8    on a verdict on the greater offense, they then could consider the lesser offense, without any

9    requirement stated that they first much reach unanimous agreement as to an acquittal on the

10   greater offense.   The charge in this case was an "unable to agree" instruction, not an

11   "acquittal first" instruction.   Petitioner calling one thing the other does not make it the other.

12   This claim lacks any legal or factual foundation, whether on *de novo* or deferential review.

13         Ground 3 does not provide a basis for federal habeas relief.

14   ***Ground 4:   Comment Upon Invocation of Fifth Amendment Rights***

15         In Ground 4, petitioner alleges that his "constitutional rights" under the Fifth, Sixth and

16   Fourteenth Amendments were violated when the State commented upon his invocation of his

17   Fifth Amendment rights.[56]

18         While McCaskill was testifying on direct examination at trial, he unilaterally testified that

19   he requested counsel and thereby terminated the first police interview and that he invoked

20   his right to be silent on the advice of counsel thereby terminating a second interview.   Neither

21   response was called for by the question asked by his counsel.[57]   On cross-examination, the

22   prosecutor asked two short questions confirming that the officer promptly terminated the first

23   interview after McCaskill requested counsel.   The thrust of the examination that followed

24   focused on the fact that petitioner lied to the police when he did talk, not that he invoked

25   either his right to be silent or his right to counsel.   #66, Ex. 71, at 496-98.   Thereafter, during

26   _____

27         [56]Misconstruing the screening order, petitioner divided this single claim into two subparts.

28         [57]#66, Ex. 71, at 479-81.

-26-

1    a detective's rebuttal testimony, the prosecutor referred in the preface to a question that "his

2    request for a lawyer has already come out in court" and that the detective was "permitted to

3    comment on it."  The line of inquiry, however, did not delve into any discussion of either

4    petitioner's request for counsel or his election to remain quiet, focusing again on the point that

5    McCaskill lied to the police in what he did say.[58]

6           On state post-conviction review, petitioner raised a related claim of ineffective

7    assistance of counsel.   The state district court appointed counsel and conducted an

8    evidentiary hearing.  One of the defense co-counsel testified at the hearing that he did not

9    believe that defense counsel objected to the State's reference to petitioner's invocation of his

10   Fifth and Sixth Amendment rights because his "understanding was that Mr. McCaskill brought

11   it up himself, and so that kind of opened the door." The other co-counsel similarly testified that

12   "he said it on his own."[59]   The state district court found that "[t]he trial record reveals that

13   McCaskill himself was the first to mention that he had demanded counsel."[60]

14          On the state post-conviction appeal, the Supreme Court of Nevada, in pertinent part,

15   held as follows in the course of discussing a related claim of ineffective assistance of trial

16   counsel:

17                      . . . .  At trial, appellant took the stand in his own behalf
                  and during direct examination mentioned that he had invoked his
18                right to counsel.  Review of the trial transcript, the evidentiary
                  hearing in the district court, and the district court's findings of fact
19                reveals that trial counsel did not suggest that appellant comment
                  on his invocation of the right to counsel but that appellant "said it
20                on his own."  To the extent that appellant complains of trial
                  counsel's failure to object to cross-examination, we note that
21                appellant "opened the door" in this regard and thus it is not
                  reasonably probable that trial counsel's objection would have
22                been sustained. Further, appellant failed to demonstrate that an
                  objection would have had a reasonable probability of leading to
23                a different outcome at trial.

24   #71, Ex. 144, at 4 (footnote omitted).

25   _____

26          [58]#66, Ex. 71, at 510-15.

27          [59]#70, Ex. 121, at 36 & 54-55.

28          [60]#70, Ex. 127, at 3.

1    Ground 4 does not provide a basis for federal habeas relief, whether under deferential

2    AEDPA review or *de novo* review.[61]

3    Petitioner urges that "[t]he prosecutor was present for the exchange [on direct

4    examination of McCaskill] and presumably observed that trial counsel opened the door, not

5    McCaskill."[62] This assertion flies in the face of factual determinations both by the state district

6    court and the Supreme Court of Nevada to the contrary.  These factual determinations are

7    amply supported by the record and are entitled to a presumption of correctness on federal

8    habeas review, even on *de novo* review otherwise as to the law.  Moreover, the trial transcript

9    reads the same way to this Court, as it is evident that McCaskill's references to requesting

10   counsel and to electing to remain silent were not responsive to the questions asked by his

11   seasoned defense counsel at trial.  It was McCaskill's own on the one hand overly ebullient

12   and on the other nonresponsive answers to questioning – evident throughout his testimony

13   on both direct and cross-examination – that led to his unilaterally making references to

14   requesting counsel and electing to remain silent.[63]

15   Against that backdrop, petitioner cites no apposite law establishing that the relatively

16   innocuous passing references by the prosecutor to what McCaskill already had himself said

17   from the stand deprived petitioner of a fundamentally fair trial or otherwise violated his

18   constitutional rights.  The decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), is not apposite to

19   the circumstances presented in this case.  In *Doyle*, it was the prosecutor who broached the

20   topic of the defendants having invoked their right to be silent, and he did so in a manner that

21   sought to draw a negative impeachment inference from the defendants' election to remain

22

23   ───────────────

24   [61]Respondents have not challenged the exhaustion of the underlying substantive claim, apparently on the basis that the claim was raised on the state post-conviction appeal but not explicitly addressed by the state supreme court.  In all events, the Court reaches the same conclusion on either deferential or *de novo* review, without regard to whether or not the underlying substantive claim was implicitly rejected on the merits.

25

26   [62]#54, at 16.

27   [63]See also #70, Ex. 121, at 39-40 & 54 (corresponding testimony by both defense co-counsel at the state post-conviction evidentiary hearing concerning McCaskill's penchant for giving nonresponsive answers despite the advice and efforts of counsel prior to trial in attempting to prepare McCaskill for taking the stand).

28

1  silent.  Here, McCaskill himself broached the topic, and the prosecutor did not seek to draw

2  a negative inference from either election rather than from McCaskill's lies to the police.

3        The present case also does not turn upon the principle that a defendant may invoke

4  the right to remain silent even after starting to make a statement.  That principle was honored

5  in this case, as the police terminated the interviews promptly once petitioner invoked his right

6  to counsel or to remain silent.  At issue in this case, in contrast, is whether, once McCaskill

7  himself opened the door and referred at trial to his request for counsel and election to remain

8  silent the prosecutor's again relatively innocuous references thereafter deprived him of his

9  constitutional rights.  The Court holds that they did not.

10        Ground 4 therefore does not provide a basis for federal habeas relief.

11        ***Ground 5:  Effective Assistance of Trial Counsel***

12        In Ground 5, petitioner alleges that he was denied a right to effective assistance of trial

13  counsel in violation of the Sixth and Fourteenth Amendments.  He alleges multiple distinct

14  instances of alleged ineffective assistance, which are discussed in more detail below.

15        On a claim of ineffective assistance of counsel, a petitioner must satisfy the

16  two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984).  He must demonstrate

17  that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

18  counsel's defective performance caused actual prejudice.  On the performance prong, the

19  issue is not what counsel might have done differently but rather is whether counsel's

20  decisions were reasonable from his perspective at the time.  The  court starts from a strong

21  presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the

22  prejudice prong, the petitioner must demonstrate a reasonable probability that, but for

23  counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*

24  *Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

25        While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review

26  is "doubly deferential" in a case governed by the AEDPA.  In such cases, the reviewing court

27  must take a "highly deferential" look at counsel's performance through the also "highly

28  deferential" lens of § 2254(d).  *Pinholster*, 131 S.Ct. at 1403 & 1410.

1

***Ground 5(a/b):  Failure to Seek Different Transition Instruction***

2   In Ground 5(a/b),[64] petitioner alleges that he was denied effective assistance of

3   counsel when trial counsel failed to request a proper "unable to agree" transition instruction

4   in lieu of an improper "acquittal first" transition instruction allegedly given at trial.   As

5   discussed as to Ground 3, *supra*, the underlying substantive claim is wholly flawed both

6   factually and legally.  As both the state supreme court and this Court have held, the transition

7   instruction given at petitioner's trial *was* an "unable to agree" instruction.  This related claim

8   of ineffective assistance of counsel thus also is flawed both factually and legally.  Moreover,

9   trial counsel would not have had the benefit of the *Green* state case at trial, as it was decided

10   well after trial.  Ground 5(a/b) accordingly does not provide a basis for federal habeas relief.

11

***Ground 5(c/d):  Protection of Invocation of Fifth Amendment Rights***

12   In Ground 5(c/d), petitioner alleges that he was denied effective assistance of counsel

13   when trial counsel failed to protect the invocation of his Fifth Amendment rights, in regard to

14   the circumstances discussed as to Ground 4.

15   The Supreme Court of Nevada held that petitioner failed to demonstrate that counsel's

16   performance was deficient or that he was prejudiced, for the reasons quoted in the discussion

17   previously in Ground 4.   For substantially the reasons canvassed by this Court as to the

18   substantive claim in Ground 4, the state supreme court's rejection of this claim was neither

19   contrary to nor an unreasonable application of *Strickland* or other clearly established federal

20   law.  *Inter alia*, on the ineffective-assistance claim in particular, petitioner cannot demonstrate

21   a reasonable probability of a different outcome at trial had trial counsel objected to the State's

22   references to the invocation of rights that petitioner already himself had referenced.

23   Ground 5(c/d) therefore does not provide a basis for federal habeas relief.

24

25   _____

26   [64]Petitioner misconstrued the Court's screening order to mean that a claim of ineffective assistance
     of counsel in violation of the Sixth Amendment must be alleged as a separate claim from the same claim

27   under the Fourteenth Amendment.  The invocation of two constitutional amendments, particularly where one
     of the Bill of Rights is applied through the Fourteenth Amendment, clearly does not present two claims.  To

28   avoid any unnecessary initial confusion on review, the Court follows this unusual labeling of the subparts,
     given that petitioner identifies the next in truth single subpart as Ground 5(c) and (d).

1    ***Ground 5(e):  Alleged Failure to Litigate Exclusion of Evidence of Violent Nature***

2           In Ground 5(e), petitioner alleges that he was denied effective assistance of counsel

3    when trial counsel allegedly failed to litigate the trial court's exclusion of evidence of the

4    violent nature of the victim.

5           At the outset on this claim, the Court will take up petitioner's motion (#86) for

6    reconsideration.

7           In a prior motion to dismiss, respondents moved to dismiss an independent substantive

8    claim potentially included within Ground 5(e) as procedurally defaulted, following upon the

9    state supreme court's holding in that regard on state post-conviction review.  Petitioner

10   appeared to concede in response that he was not raising a substantive claim as well.  The

11   Court found based upon this apparent concession that Ground 5(e) did not include an

12   independent substantive claim.  However, the Court allowed petitioner a limited opportunity

13   to seek reconsideration of that finding.  He since has done so.[65]

14          The Court is not inclined to grant the motion for reconsideration.

15          The Court's screening order (#48), which reflects established practice in this District,

16   clearly identified one of the principal deficiencies in the initial counseled amended petition:

17                    . . . .  The pleading . . . is deficient in form in a number of
                 respects that must be corrected prior to directing a response.
18               While the Court is reluctant to have further delay in this case
                 given its age, *inter alia*, the amended petition must be presented
19               in a manner where the discrete claims presented can be identified
                 as such by respondents and responded to accordingly.
20                                          . . . . .

21                    [P]etitioner must present one constitutional claim per
                 ground. The present pleading combines multiple claims together
22               under single grounds, *including, in particular, independent*
                 *substantive claims of trial court error with claims of ineffective*
23               *assistance of trial and/or appellate counsel*. The Court and
                 respondents need to be able to identify which discrete claims
24               actually are being presented. It is exceedingly difficult to ascertain
                 from the present pleading in all instances whether petitioner is
25               seeking to present an additional claim for relief or instead is
                 referring to a constitutional issue in passing as background to
26               another claim. The Court and the respondents need to be able to

27   _____

28   [65]See ## 85 & 86.

                                          -31-

1

2

> clearly identify what claims are being presented and what the specific claimed basis for exhaustion of those claims is.
>
> Petitioner therefore must: (a) *separate all claims of independent substantive error presented from each other and from claims of ineffective assistance of trial counsel and/or appellate counsel*; (b) present all claims of ineffective assistance of trial counsel under a single consolidated ground broken down by subparts for each discrete claim of error (i.e., "A," "B", etc.); (c) similarly present all claims of ineffective assistance of appellate counsel in a single consolidated ground broken down by subparts; and (d) identify in the pleading the specific basis for exhaustion for each ground or subpart thereof. Petitioner of course may incorporate allegations from a prior ground in the course of stating another claim or ground based in whole or in part on the same facts. If the amended petition filed in response to this order refers in passing to other possible constitutional violations that are not set forth as a separate ground and for which no statement of exhaustion is provided, *the passing reference will not be regarded to be a claim upon which relief actually is being sought*.

#48, at 4 (emphasis added).

Petitioner apparently substantially complied with this provision of the screening order as to all other claims in the second counseled amended petition (#54). Throughout the pleading, claims of independent substantive error are presented separately from one another and from claims of ineffective assistance of trial counsel and/or appellate counsel. And petitioner conceded in the opposition to respondents' motion to dismiss that Ground 5(e) similarly presented only a claim of ineffective assistance of trial counsel rather than an ineffective-assistance claim combined with an independent substantive claim.

Even if the Court were inclined to allow this concession to be withdrawn, which it is not, withdrawal of the concession merely would establish that claims were combined in Ground 5(e) in contravention of the screening order. The reason for the clarity required by the order was to avoid just this sort of situation in a three-plus year-old case where even petitioner's counsel has been unable to consistently identify which claims are and are not presented. To the extent, *arguendo*, that Ground 5(e), which on its face is presented as a claim of ineffective assistance of counsel, attempts to also include an independent substantive claim of trial court error, it does so in contravention of the screening order. Under that order, the embedded reference "will not be regarded to be a claim upon which relief actually is being sought."

-32-

1     Further, in the alternative, the Court holds that any substantive claim *arguendo* properly

2   presented in Ground 5(e) is procedurally defaulted.   The only possibly viable basis to

3   overcome the procedural default of this independent substantive claim would be premised

4   upon a claim of alleged ineffective assistance of appellate counsel for failing to raise the

5   substantive claim on direct appeal.   As the Court holds with regard to Ground 6(e), *infra*,

6   petitioner cannot demonstrate ineffective assistance of appellate counsel in this regard.   He

7   therefore cannot establish cause and prejudice to overcome the procedural default of the

8   independent substantive claim.   An appellate advocate is not required to raise every

9   nonfrivolous ground that a defendant allegedly would want to pursue. *See,e.g., Jones v.*

10  *Barnes*, 463 U.S. 745 (1983).

11    The Court accordingly addresses a claim only of ineffective assistance of trial counsel

12  under Ground 5(e).

13    With regard to that claim, trial counsel did in fact actively seek to introduce evidence

14  of the alleged violent character of the victim, Joseph Galdarisi.

15    Defense counsel filed a pretrial motion to offer character evidence and prior bad act

16  evidence as to Galdarisi.   Defense counsel further filed a pretrial motion seeking disclosure

17  of any criminal records of Galdarisi.   Defense counsel additionally presented argument in

18  opposition to a State motion to exclude evidence of any specific acts of violence by Galdarisi.

19  The trial court ruled pretrial that the court would not allow introduction of evidence of any

20  specific acts unless the defendant testified that he was aware of the prior incident at the time.

21  The court further ruled that it would allow evidence as to reputation or opinion as to violent

22  character.   The court directed the State to provide the defense with a copy of a NCIC "rap

23  sheet" reflecting any prior arrests or offenses for Galdarisi.[66]

24    The State thereafter ran a rap sheet for Galdarisi and provided it to the defense.   The

25  rap sheet reflected "one or two spousal batteries" in California.   #66, Ex. 69, at 86.

26    / / / /

27  _____

28    [66]#64, Ex. 36; #65, Ex. 48; *id.*, Ex. 52 (State motion); #65, Ex. 58, at 9-22; *id.*, Ex. 59.

-33-

1    During Michelle Maberry's testimony at trial, counsel were unable to agree regarding

2 the proper scope of questioning of Maberry and possibly other witnesses as to Galdarisi's

3 alleged reputation for being mean and violent when he was angry.   The trial court heard

4 testimony from Maberry on the point outside the presence of the jury.[67]   The examination

5 culminated with the following exchange:

6           Q:   By the way, you said that in response to a leading
                 question that he had a reputation for being violent
7                if provoked.   So what was his reputation, as you
                 call it reputation, if he wasn't provoked?

8           A:   He was calm.

9           Q:   When you say he had a reputation for being violent
10               if provoked, you mean defending himself?

11          A:   *No. I mean this is not in context with men.  I'm
                 talking in context with women*. His previous wives
12               would push him, and he'd say, hey, no, I need to
                 back off, and he'd walk away. If they kept going at
13               him, he would hit them.  And he stated that to me
                 many times, that as long as someone would just let
14               him be and walk away, he wouldn't get to that point.

15 #66, Ex. 69, at 92-93 (emphasis added).

16    The trial court excluded the proffered reputation evidence on the following ground:

17           THE COURT: I am going to exclude the
18 evidence on the basis that I don't think it is relevant,
   the reputation of the way he treats women isn't
19 relevant to what he does with men absent some
   other showing of  - I assume you are going to ask
20 the other witnesses what they see the reputation
   as.  Maybe they didn't see it solely this way.  But
21 based on the witness's testimony and the offer to
   prove, she limited it only to women, and therefore,
22 it wouldn't be admissible.

23 #66, Ex. 69, at 97; see also *id.*, at 94-97 (related discussion).

24    McCaskill testified that Galdarisi was known to be aggressive.  He also testified that

25 he heard Maberry say he had a tendency to be violent and aggressive physically, perhaps

26 referring to her proffered testimony outside the presence of the jury.  An objection was

27

28    [67]#66, Ex. 69, at 85-97.

1  sustained to a question to McCaskill seeking to establish that McCaskill had a reputation in

2  the community as a talker whereas Galdarisi's reputation was as a doer, as to a question thus

3  seeking testimony by McCaskill as to his own reputation.[68]

4       McCaskill did not provide any testimony when he was on the stand at trial that he was

5  aware of any prior specific act of violence by Galdarisi.

6       At the state post-conviction hearing five years later, McCaskill maintained that he was

7  aware of prior specific acts of violence by Galdarisi against a former wife or girlfriend because

8  Galdarisi bragged about the incidents to McCaskill.[69]

9       The state district court found that McCaskill's evidentiary hearing testimony "was

10  largely incredible" and further that the prior acts "were *not* known to the defendant."[70]

11       The Supreme Court of Nevada rejected the claims of ineffective assistance of both trial

12  and appellate counsel presented to that court on the following basis:

13              [A]ppellant claims that trial counsel was ineffective for
failing to further litigate the district court's exclusion of evidence

14              of the victim's violent nature. Specifically, appellant contends that
trial counsel should have done more to admit testimony that on

15              the night before the incident in question, the victim had kneed his
wife in the stomach, as that was further evidence that the victim

16              was violent and that appellant acted in self-defense. Appellant
also claims that appellate counsel was ineffective for failing to

17              raise this issue on direct appeal. Appellant failed to demonstrate
that trial counsel's performance was deficient or that he was

18              prejudiced. The record reflects that trial counsel tried twice to
admit the evidence: once in a pre-trial motion and again during

19              the testimony of Michelle Cummings [Maberry]. Therefore,
inasmuch as appellant claims that trial counsel failed to pursue

20              this issue in the district court, his claim is belied by the record.
Moreover, the district court's decision was based on established

21              Nevada law that, while evidence of a victim's violent reputation is
admissible, a prior act of violence by a victim is not admissible to

22              show the state of mind of a defendant claiming that he acted in
self-defense unless the accused demonstrates that he had actual

23              knowledge of that act. After the evidentiary hearing, the district

24

25     [68]#66, Ex. 71, at 472.

26     [69]#70, Ex. 121, at 88-90.

27     [70]#70, Ex. 127, at 2 & 4 (emphasis in original). Petitioner notes that the state district court made this
finding "despite" his evidentiary hearing testimony, apparently proceeding on the premise that his testimony

28  must be accepted as true by the trier of fact. That is not the law.

1
2
3
4
5
6

> court found that appellant did not know of this specifc act prior to his altercation with the victim, and this finding is entitled to deference. Accordingly, appellant failed to demonstrate a reasonable probability that had trial counsel raised this issue a third time the result would have been different. Inasmuch as appellant seeks a change in the law, we decline to revisit our prior decisions. And to the extent that appellant claims his appellate counsel was ineffective, we conclude that appellant failed to demonstrate that this claim had a reasonable probability of success on appeal. Therefore, the district court did not err in denying this claim.

7   #71, Ex. 144, at 5-7 (footnotes omitted).

8   The state supreme court's rejection of the claim of ineffective assistance of trial
9   counsel was neither contrary to nor an unreasonable application of *Strickland*.

10   As the state high court observed, defense counsel litigated the issue, both as to
11   reputation and prior acts, extensively, and the trial court ruled against the defense. Petitioner
12   urges that the trial court incorrectly decided the issue. However, even if this Court were to
13   assume *arguendo* that the trial court erred in excluding the evidence – which, as discussed
14   *infra* as to Ground 6(e), would not be a correct assumption based on the record presented
15   and the governing law – any such purported error by the trial court would not establish
16   ineffective assistance by trial counsel. Defense counsel extensively litigated the issue, and
17   lost. There clearly was no deficient performance by defense counsel, who in fact vigorously
18   pursued the issue at the trial level. Nor can petitioner demonstrate a reasonable probability
19   of a different outcome had defense counsel pursued the issue even more extensively after
20   the trial court considered the law and evidence and ruled against the defense. Merely
21   because petitioner continues to disagree with the trial court's ruling does not establish a
22   reasonable probability that trial counsel could have secured a different ruling by persisting in
23   a rejected argument or arguing the rejected position differently.

24   Ground 5(e) therefore does not provide a basis for federal habeas relief based upon
25   alleged ineffective assistance of trial counsel.[71]

26   _____

27   [71]Petitioner relies upon an affidavit by Michelle Maberry that "clarified some of her testimony." #54, at 26-27; #61, Ex. 9, at electronic docketing pages 4-5. The September 29, 2011, affidavit in this 2008 habeas
28   (continued...)

-36-

***Ground 5(f/g):  Alleged Motive to Fabricate Testimony by Nikki Batemon***

In Ground 5(f/g), petitioner alleges that he was denied effective assistance of counsel when trial counsel allegedly failed to confront prosecution witness Nikki Batemon regarding an alleged motive to fabricate her testimony based upon her wanting sole custody of their son.

Co-counsel Jerome Wright testified as follows at the state post-conviction evidentiary hearing:

> Q:   Do you recall any issue whether Nicky Bateman [sic] had a motivation to lie during her testimony against Mr. McCaskill?
>
> A:   I know there was an issue about custody of the children, so the answer to that would be yes.  In my opinion, it was irrelevant, because the issue was what happened out in the street or out in the dirt with Mr. McCaskill and Mr. Galdarisi.

#70, Ex. 121, at 46-47.  Wright continued with the point that the two women testified only as to the events leading up to the final altercation, which they did not see.  He did not recall whether or not he or instead his co-counsel cross-examined Batemon.  He testified, however, that "I don't know that I would have examined on that [custody], being the defense was self-defense, and I was hoping Mr. McCaskill could explain to the jury how he was out there in self-defense."[72]

In his testimony at trial, McCaskill differed with Nikki Batemon's testimony only regarding whether she still had feelings for him by the time of trial, regarding the exact location where he asked the women to lie for him to cover up that he was the one that killed Galdarisi, regarding whether he bragged about stabbing Galdarisi, and regarding whether it

---

[71](...continued)
case may not be considered because it was not presented to the state courts when they decided the claim on the merits.  *See Pinolster,* 131 S.Ct. at 1398-1401.  Moreover, trial counsel's litigation of the issue necessarily would have been based upon Maberry's testimony on the stand in 2003, not upon how she possibly might "clarify" that testimony eight years later in 2011 on federal habeas review.  *E.g., Harrington v. Richter*, 131 S.Ct. 770, 779 (2011)(reviewing court must evaluate counsel's conduct from his perspective at the time).

[72]#70, Ex. 121, at 47.

-37-

1   was her idea or his idea for him to change clothes.  He did not disagree with her testimony

2   on any other point, whether as to the leadup to his stabbing Galdarisi or as to what occurred

3   thereafter.[73]

4       The Supreme Court of Nevada rejected the claim presented to that court on the

5   following grounds:

6

7           Finally, appellant claims that trial counsel was ineffective
        for failing to cross-examine a witness about her motivation to lie
7       at trial.  Specifically, appellant argues that trial counsel should
        have cross-examined Nikki Batemon, the mother of appellant's
8       child, about custody proceedings regarding their child and
        Batemon's possible motivation to implicate the appellant.
9       Appellant failed to demonstrate that he was prejudiced. First,
        Batemon did not testify at the evidentiary hearing on his petition,
10      and thus appellant has failed to provide specific evidence of the
        testimony that would have resulted from cross-examination.
11      Further, our review of the record reveals that Batemon was not a
        witness to the stabbing and that her testimony did not conflict with
12      the appellant's in any material way. Accordingly, appellant failed
        to demonstrate a reasonable probability that cross-examination
13      of Batemon on this subject would have produced a different result
        at trial. Finally, trial counsel testified that he was aware of
14      appellant's custody battle with Batemon, but considered it
        irrelevant. To the extent that trial counsel made a tactical decision
15      not to question Batemon about her custody battle, we note that
        in the context of claims of ineffective assistance of counsel, "'a
16      tactical decision . . . is virtually unchallengeable absent
        extraordinary circumstances.'"  Appellant did not demonstrate
17      extraordinary circumstances here. Therefore, the district court did
        not err in denying this claim.
18

19   #71, Ex. 144, at 8-9 (footnotes omitted).

20       The state supreme court's rejection of this claim was neither contrary to nor an

21   unreasonable application of *Strickland*, particularly under the doubly deferential standard of

22   review applicable in this context.  The tactical decision by counsel to not pursue impeachment

23   on the hardly compelling basis that Batemon would lie to convict McCaskill of potentially first-

24   degree murder so that she could gain custody of their son is "virtually unchallengeable" under

25   the *Strickland* standard.  *See Strickland*, 466 U.S. at 690.  The state supreme court's

26   determination that there was not a reasonable probability that cross-examination along these

27

28      [73]#66, Ex. 71, at 484-85, 490-94, 499-502 & 505.

-38-

1    lines would have affected the outcome of the trial similarly was not an unreasonable

2    application of *Strickland*.  Such a method of attempted impeachment, again, hardly presented

3    a compelling attack on the witness' credibility.  While undeniably a conceivable approach to

4    challenging her motive to testify as she did, it hardly necessitated rejection of her testimony,

5    which on many points also was corroborated by Maberry's testimony.   And Batemon's

6    testimony in all events differed from McCaskill's testimony on few material points.  The state

7    supreme court accordingly quite reasonably could conclude that there was not a reasonable

8    probability that attempted impeachment on this point would have altered the outcome at trial.

9         Ground 5(f/g) therefore does not provide a basis for federal habeas relief.[74]

10        / / / /

11        / / / /

12

13   _____

14       [74]Petitioner alleges in the amended petition – with no citation to state court record support – that
     Batemon lost a "bitter battle" for custody of the son to McCaskill's mother during the pendency of the criminal
15   proceedings and that the grandmother thereafter has retained sole custody "to date."  Federal habeas review
     is limited to the record presented to the state court that decided the claim on the merits.  *Pinholster, supra.*
16   Moreover, it would appear that Batemon allegedly losing custody to Mrs. McCaskill would undercut the claim
     of a motive to fabricate, as it suggests that the outcome of the criminal trial as to Jeremy McCaskill had no
17   impact on whether Batemon could secure custody as against Mrs. McCaskill.  Such alleged facts further
     would reflect how increasingly collateral litigation of the point would have become at trial if it were delved into
18   as an attempted basis for impeachment.  Defense counsel instead focused on the central issue, pursuing a
     defense of self-defense as to an altercation that was not witnessed by Batemon, under anyone's testimony.

19       Petitioner further suggests within Ground 5(f/g) that there were inconsistencies between Batemon's
20   police statements and her trial testimony that counsel did not pursue during cross-examination.  As discussed
     with regard to Ground 5(e), the screening order in this case clearly stated that petitioner could present only
21   one constitutional claim per ground or subpart.  A claim that counsel failed to impeach a witness' testimony
     with prior inconsistent statements is a distinct claim from a claim that counsel failed to confront the witness
22   with an alleged motive to fabricate her testimony.  As the screening order stated, any references to other
     constitutional claims within a ground would  not be regarded as presenting a claim for relief.  Even if such a
23   claim were presented herein – and exhausted – there is not a reasonable probability that cross-examining
     Batemon regarding the alleged inconsistencies in question would have changed the outcome at trial.  See
24   #54, at 27 (outlining alleged inconsistencies).  For example, the outcome in the case did not turn upon
     whether Galdarisi did or did not actually hit McCaskill with the Pepsi can.  Having thrown a Pepsi can at
25   McCaskill did not justify McCaskill stabbing Galdarisi through the heart after the can already had been thrown,
     regardless of whether or not the can hit McCaskill before then posing no threat laying on the ground.  The
26   throwing of the can may have enraged McCaskill, but it provided him with absolutely no valid basis for a self-
     defense defense.  Petitioner's focus herein on whether the soft drink can was full or empty simply is a red
27   herring.  Witnesses have varying recollections as to collateral details.  Establishing that a witness said
     something differently as to a collateral detail in a prior statement frequently does not lead to either a rejection
28   of their testimony or an acquittal.

1    ***Ground 5(h):  Sentencing***

2          In Ground 5(h), petitioner alleges that he was denied effective assistance of trial

3    counsel when counsel failed to correct an alleged misconception by the sentencing court as

4    to the effect of consecutive sentences each of 10 to 25 years as opposed to 10 to life.

5          On the conviction for second-degree murder with the use of a deadly weapon,

6    McCaskill potentially faced sentencing for either:  (a) a definite term of 25 years with the

7    possibility of parole after a minimum of 10 years had been served, with a like consecutive

8    sentence; or (b) a life sentence with the possibility of parole after a minimum 10 years had

9    been served, with a like consecutive sentence.

10         On both possible sentencing options, McCaskill faced a minimum 20 years

11   incarceration if institutionally paroled from the first consecutive sentence to the second once

12   the minimum 10 years had been served on the first sentence.  The difference between the

13   two sentencing options concerned whether he would be subject to parole supervision for life

14   following a noninstitutional parole on the second consecutive sentence or instead only

15   through the expiration of the second 25-year consecutive sentence.

16         The Department of Parole and Probation recommended the maximum sentencing

17   option of consecutive sentences of life with the possibility of parole after 10 years on each

18   sentence.

19         Defense counsel argued for the minimum consecutive 10 to 25 year sentences, *inter*

20   *alia*, to give McCaskill "an opportunity to get out and get back with his son and his family."[75]

21         The State, in pertinent part, argued as follows:

22                Your Honor, because of the good time credit he will receive
            in prison, if you impose the term of years he will flatten out the
23          term either at the time he is released or very, very shortly
            thereafter because of the good time credits.  We want the
24          Division  to be supervising him forever, to be checking on him
            occasionally to see how he is doing to make sure that once he is
25          released and once he has paid his debt for this crime, he does
            not do something similar to someone else. So we think it's a very
26          good idea to have supervision over him after he is released.

27   _____

28         [75]#67, Ex. 80, at 17-18.

                                        -40-

Obviously, Your Honor, drinking had a lot to do with this event, drinking by Mr. McCaskill. And the parole authorities may have some ability to limit that or to impose appropriate conditions to stop that.

. . . . .

And again, the key to us the time actually spent is not going to be that great, although it is possible that he could spend the rest of his life in prison. But our concern is that if the parole authorities – I'm sorry, if the prison authorities do release him, we want him supervised because we believe that's the best for the community and to protect the community. So we would ask Your Honor to reject the defense suggestion and to sentence him to life imprisonment, with parole eligibility in ten years with the underlying second degree murder count and then a consecutive term of equal length for the use of the deadly weapon in the offense.

#67, Ex. 80, at 18-19 & 20.

The court thereafter stated, after McCaskill personally addressed the court:

Of significance to me is the State's request for supervision after the flattening out of time in prison. Based upon the statute, Mr. McCaskill must serve a minimum of twenty years before he can be paroled. And if I give him 50 years as the top, that would be, he would be paroled without a parole tail which would also mean 20 years from now he would have no help in the community. I don't know how much parole does, but they do provide something. They do provide some support other than just putting somebody at the prison gate after twenty years with l00 bucks in their pocket. And although you have lots of family and parents now, Mr. McCaskill, twenty years from now I can't say how many, what your parents will be, what kind of condition they will be in.

. . . . .

. . . . I think that this case based on the circumstances of the case would be appropriate for a 50-year sentence, the 10 to 25, but I am concerned about the lack of a parole tail and the lack of a support group after being released from custody after so long. And everyone tells me it makes no difference if it's 25 or life in terms of parole. So, that's why I'm going to go along with the recommendation of the Division.

#67, Ex. 80, at 22-23.

On state post-conviction review and thereafter, petitioner has urged that the sentencing court's statement that "it makes no difference if it's 25 or life in terms of parole" indicated that the court thought that there was no difference between a determinate sentence, as to which parole ultimately would end, and a life sentence, where it would not.

-41-

1    The state district court rejected the claim on the basis, first, that it did not
2    misapprehend the effect of the sentence imposed and, second, that it would have imposed
3    the same sentence as at sentencing following the argument presented on post-conviction
4    review.[76]

5    The state supreme court held that petitioner had failed to demonstrate a reasonable
6    probability of a different result at sentencing, given, *inter alia*, the district court's finding that
7    its sentence would have been the same even with the argument presented on state post-
8    conviction review.[77]

9    The state supreme court's rejection of this claim was neither contrary to nor an
10   unreasonable application of clearly established federal law.

11   The claim is fundamentally factually flawed.  The phrase taken out of context from the
12   sentencing does not reflect that the sentencing court did not understand the difference
13   between sentencing McCaskill to a determine sentence with a closed-end parole and
14   sentencing him to life with no end to parole.  Sentencing McCaskill to a sentence with parole
15   for life rather than a closed-end parole was the very *raison d'être* for the sentencing decision
16   made by the court.  The court clearly understood the difference because it was the existence
17   of that very difference that was the reason for the sentence imposed.  When the court said
18   that "it makes no difference if it's 25 or life in terms of parole" it very clearly meant in context
19   only that there was no difference if it was 25 or life in terms of *getting* parole.  That point is
20   regularly made in Nevada sentencing proceedings that the imposition of a life sentence as
21   opposed to a determinate sentence has no impact on whether an inmate will receive parole,
22   which turns instead on other factors.  As discussed at length at the sentencing hearing, the
23   critical difference in the two sentencing options was whether parole supervision would have
24   an ultimate termination point or instead be for life.  The sentencing court clearly opted for the
25   latter.

26   ─────────────────

27   [76]#70, Ex. 127, at 3.

28   [77]#71, Ex. 144, at 7-8.

1   There accordingly simply was nothing to object to or challenge in the sentencing
2   determination made by the court.[78]

3   Ground 5(h) therefore does not provide a basis for federal habeas relief.[79]

4   **Ground 5(i)**

5   The Court will grant petitioner's motion (#92) to dismiss the unexhausted Ground 5(i).

6   **Ground 6:  Effective Assistance of Appellate Counsel**

7   In Ground 6, petitioner alleges that he was denied a right to effective assistance of
8   appellate counsel in violation of the Sixth and Fourteenth Amendments.  He alleges multiple
9   distinct instances of alleged ineffective assistance, which are discussed in more detail below.

10  When evaluating claims of ineffective assistance of appellate counsel, the performance
11  and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263
12  F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

13

14  [78]There similarly was nothing to object to or correct in the State's presentation.  The State was
15  arguing precisely for the sentencing result properly reached by the court.  Neither the State nor the court
    equated the ultimate parole exposure on a 10 to 25 sentence to the parole exposure on a life sentence.  The
16  State instead argued for, and the court sentenced McCaskill to, a life sentence precisely so that he would be
    subject to parole for life rather than for a finite period.

17  Petitioner further suggests, based on state post-conviction evidentiary hearing testimony, that
18  defense counsel did not understand that the full 10-year minimum had to be served, without reduction for
    good time, before McCaskill would be eligible for parole consideration on each sentence.  However, any such
19  alleged misunderstanding had nothing to do with the exhausted claim of error presented in Ground 5(h),
    which pertains to the tail end of the sentence, not the minimum.  Nor could  any such misunderstanding
20  prejudice petitioner in this sentencing following a verdict rather than a plea.  On either sentencing alternative,
    McCaskill was going to serve the same 10-year minimum sentence.  That is, with a choice only between 10 to
21  25 and 10 to life, counsel allegedly misunderstanding how the 10 was served was not going to change the
    fact that McCaskill was going to be sentenced to the 10 year minimum regardless on either option.

22  [79]Moreover, "the Supreme Court has not delineated a standard which should apply to ineffective
23  assistance of counsel claims in noncapital sentencing cases [such that] ... there is no clearly established
    federal law as determined by the Supreme Court in this context." *Davis v. Grigas*, 443 F.3d 1155, 1158 (9th
24  Cir.2006)(quoting prior authority); *Davis v. Belleque*, 2012 WL 76897 (9th Cir., Jan. 11, 2012)(unpublished);
    *Vigil v. McDonald*, 2011 WL 5116915 (9th Cir., Oct. 28, 2011) (unpublished)(harmonizing authority).  Because
25  there was no clearly established United States Supreme Court precedent that applies in this noncapital
    sentencing context, petitioner cannot establish that the state courts' rejection of his claim was either contrary
26  to or an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Id.*
    Even if the Supreme Court were to announce such law subsequently, the state supreme court's decision
27  nonetheless must be viewed in relation to the law at the time of the state supreme court's November 14,
    2008, decision on the merits on state post-conviction review.  *Greene v. Fisher*, 132 S.Ct. 38 (2011).  Ground
28  5(h) in any event is factually flawed as discussed in the text.

1    Effective appellate advocacy requires weeding out weaker issues with less likelihood of

2    success.  The failure to present a weak issue on appeal neither falls below an objective

3    standard of competence nor causes prejudice to the client for the same reason – because the

4    omitted issue has little or no likelihood of success on appeal.  *Id.*

5              ***Ground 6(a/b):  Transition Instruction***

6              In Ground 6(a/b),[80] petitioner alleges that he was denied effective assistance of

7    counsel when appellate counsel failed to challenge the failure of the trial court allegedly to

8    give a proper "unable to agree" transition instruction in lieu of an improper "acquittal first"

9    transition instruction.  As discussed, *supra*, with respect to parallel claims in Grounds 3 and

10   5(a/b),the underlying substantive claim is wholly flawed both factually and legally.  As both the

11   state supreme court and this Court have concluded, the transition instruction given at

12   petitioner's trial *was* an "unable to agree" instruction.   This related claim of ineffective

13   assistance of counsel therefore also is fundamentally flawed both factually and legally.  The

14   state supreme court's rejection of this claim accordingly was neither contrary to nor an

15   unreasonable application of *Strickland* because there was neither deficient performance in

16   nor resulting prejudice from appellate counsel's failure to pursue this fundamentally flawed

17   claim.

18             Ground 6(a/b) thus does not provide a basis for federal habeas relief.

19             ***Ground 6(c/d):  Comment on Invocation of Fifth Amendment Rights***

20             In Ground 6(c/d), petitioner alleges that he was denied effective assistance of counsel

21   when direct appeal counsel did not raise an issue regarding the prosecution allegedly

22   commenting on his Fifth Amendment rights, based on the allegations of Ground 4.

23             / / / /

24

25             [80]As discussed in note 64, petitioner misconstrued the Court's screening order to mean that a claim
26   of ineffective assistance of counsel in violation of the Sixth Amendment must be alleged as a separate claim
     from the same claim under the Fourteenth Amendment.  The invocation of two constitutional amendments,
27   particularly where one of the Bill of Rights is applied through the Fourteenth Amendment, clearly does not
     present two claims.  The Court follows this unusual labeling of the subparts given that the next single subpart
28   is identified as Ground 6(c) and (d).

1    The Supreme Court of Nevada held, *inter alia*, that "in light of the fact that appellant

2  opened the door, appellant failed to demonstrate that any direct appeal claim had a

3  reasonable probability of success."[81]  For substantially the reasons canvassed by this Court

4  as to the substantive claim in Ground 4, the state supreme court's rejection of this claim for

5  lack of prejudice was neither contrary to nor an unreasonable application of *Strickland* or

6  other clearly established federal law.  This conclusion especially follows with regard to the

7  claim of ineffective assistance of appellate counsel given that petitioner himself unilaterally

8  referred to his request for counsel and election to remain silent.  Moreover, there was no

9  objection interposed in the trial court to the State's references to what petitioner already

10 himself had said on the stand.

11    Ground 6(c/d) therefore does not provide a basis for federal habeas relief.

12    ***Ground 6(e):  Exclusion of Evidence of Violent Nature***

13    In Ground 6(e), petitioner alleges that he was denied effective assistance of counsel

14 when appellate counsel allegedly failed to raise an issue on direct appeal challenging the trial

15 court's exclusion of alleged evidence of the violent nature of the victim, based on the

16 allegations of Ground 5(e).

17    The background to this claim is summarized in the text, *supra*, at 33-36.

18    The Supreme Court of Nevada, in pertinent part, rejected the claim of ineffective

19 assistance of appellate counsel on the following grounds, over and above its holding rejecting

20 the related claim of ineffective assistance of trial counsel:

21         . . . .  Inasmuch as appellant seeks a change in the law, we
         decline to revisit our prior decisions.  And to the extent that
22       appellant claims his appellate counsel was ineffective, we
         conclude that appellant failed to demonstrate that this claim had
23       a reasonable probability of success on appeal.

24 #71, Ex. 144, at 6-7.

25    The state supreme court's determination that it would not change its prior decisions

26 and that there was not a reasonable probability that the claim of state law error would have

27

28       [81]#71, Ex. 144, at 5.

-45-

had a reasonable probability of success on appeal all but eliminates any prospect for success on this habeas claim.

The Supreme Court of Nevada is the final arbiter of Nevada state law. The state high court's determination that it would not change its prior decisions and that the claim of error did not have a reasonable probability of success on appeal under Nevada state law essentially is the final word on that matter. While petitioner seeks to rehash and reargue the propriety of the state district court's holding on the Nevada state law evidentiary question, a federal district court clearly does not sit as a super state supreme court with authority to review claimed errors under state law. *See,e.g., Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007). Petitioner argued to the Supreme Court of Nevada that appellate counsel failed to pursue a viable claim that the state district court erred in its evidentiary ruling, and the state supreme court held that the claim did not have a reasonable probability of success on appeal. That is the end of the matter with regard to the underlying Nevada state law evidence question.

Petitioner nonetheless urges that the state supreme court's rejection of his claim is contrary to and an unreasonable application of United States Supreme Court precedent because it transgresses a longstanding rule of law announced in the 116-year-old decision in *Smith v. United States*, 161 U.S. 85 (1896). Petitioner cites *Smith* for the proposition that "being a quarrelsome and dangerous person is competent evidence, especially if his character in this respect was known to the defendant."[82] Petitioner misapprehends the "clearly established federal law" pertinent to AEDPA review. Petitioner must demonstrate that the state supreme court's decision was contrary to or an unreasonable application of clearly

---

[82]#54, at 27. Petitioner quotes from a headnote rather than the opinion and incorrectly cites the case. The actual quote in the opinion was that "evidence that the deceased had the general reputation of being a quarrelsome and dangerous person, was competent, especially if his character in this respect was known to the defendant." 161 U.S. at 88. The case did not address the admission of specific acts. Nor did it address a situation where the reputation testimony actually proffered at trial spoke to the victim's propensity for violence only against women. The actual holding of the case was that the trial court erred when it gave a jury instruction that required the jury to disregard reputation testimony given by witnesses who themselves did not have sterling reputations.

-46-

1    established federal law applying a federal constitutional rule applicable to the case. *Smith*

2    was referring not to a principle of federal constitutional law applicable to the States but instead

3    to a principle of federal evidentiary law applicable in a federal criminal proceeding. The

4    Supreme Court of Nevada is not required to follow United States Supreme Court holdings

5    regarding federal evidentiary rules applicable in federal criminal trials. Even if, *arguendo*, the

6    Supreme Court of Nevada applied Nevada evidentiary law in a Nevada state criminal case

7    differently from the *Smith* decision, the state supreme court's decision would not be contrary

8    to or an unreasonable application of *apposite* clearly established federal law. McCaskill was

9    tried in Nevada state court under Nevada state law, not in a federal criminal proceeding. The

10    Supreme Court of Nevada, not the United States Supreme Court, is the final arbiter of

11    Nevada state law.

12        Petitioner further suggests that the state district court's evidentiary ruling constrained

13    his right to confront Michelle Maberry on cross-examination, citing to *Davis v. Alaska*, 415

14    U.S. 308 (1974). The state supreme court's holding that there was not a reasonable

15    probability of success on this subsidiary federal law argument[83] that the state law evidentiary

16    ruling denied petitioner his right of confrontation was neither contrary to nor an unreasonable

17    application of clearly established federal law. The holding in *Davis* is far afield from the

18    present case. In *Davis*, the Supreme Court held that a defendant was denied his right to

19    confrontation when the trial court did not allow him to cross-examine a prosecution witness

20    regarding being on probation for a juvenile offense. Petitioner apparently seeks to draw from

21    *Davis* a broad proposition that state evidentiary rules must yield to Confrontation Clause

22    rights. However, as the Supreme Court observed in *Harrington v. Richter*:

23

24             A state court's determination that a claim lacks merit
            precludes federal habeas relief so long as "fairminded jurists

25             could disagree" on the correctness of the state court's decision.
            *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158

26             L.Ed.2d 938 (2004). And as this Court has explained,
            "[E]valuating whether a rule application was unreasonable

27

28       [83] See #71, Ex. 140, at 21 (state post-conviction appellant's opening brief).

1    requires considering the rule's specificity. The more general the
2    rule, the more leeway courts have in reaching outcomes in
     case-by-case determinations." *Ibid*. . . . .

3    131 S.Ct. 770, 786 (2011). Here, a determination that the state evidentiary rule and the state

4    district court's application of it did not deny petitioner a right to confrontation was not an

5    unreasonable application of clearly established federal law. The Confrontation Clause does

6    not render all state evidentiary rules excluding evidence sought to be admitted by the defense

7    unconstitutional. Petitioner cites no apposite Supreme Court case law establishing that the

8    state evidentiary rule or ruling violated the Confrontation Clause.

9        Finally, petitioner points to the alleged "dearth" of meritorious issues raised by

10   appellate counsel.[84] He contends that the present claim could have been presented in lieu

11   of claims that petitioner now suggests were "worthless."[85] However, the state supreme court's

12   holding that there was not a reasonable probability of success on *this* claim was neither

13   contrary to nor an unreasonable application of clearly established federal law.

14       Ground 6(e) therefore does not provide a basis for federal habeas review.

15                        ***Evidentiary Hearing Request***

16       Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is

17   restricted to the record presented to the state court that adjudicated the merits of the claims.

18   *See Pinolster,* 131 S.Ct. at 1398-1401.

19       IT THEREFORE IS ORDERED that petitioner's motion (#92) for partial dismissal is

20   GRANTED and that Ground 5(i) is DISMISSED without prejudice as unexhausted.

21       IT FURTHER IS ORDERED that petitioner's motion (#86) for reconsideration is

22   DENIED, for the reasons assigned, *supra*, at 31-32.

23       IT FURTHER IS ORDERED that all remaining claims in the petition are DENIED on

24   the merits and that this action shall be DISMISSED with prejudice.

25   _____

26       [84]#90, at 12.

27       [85]Appellate counsel in truth presented three appeal issues in a 26-page brief, including a challenge to
     the sufficiency of the evidence, an issue pursued in the present federal petition. See #68, Ex. 96; see also
28   *id.*, Ex. 98 (reply brief).

                                        -48-

1    IT FURTHER IS ORDERED that a certificate of appealability is DENIED, as jurists of

2  reason would not find the district court's rejection of the claims presented to be debatable or

3  wrong, for the reasons assigned herein.

4    The Clerk of Court shall enter final judgment accordingly in favor of respondents and

5  against petitioner, dismissing this action with prejudice.

6    DATED:  October 16, 2012

7

8

9  _____

10  ROBERT C. JONES
   Chief United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-49-